**UNITED STATES of America**

v.

**Bilal PRETLOW.**

**Crim. A. No. 90–328.**

United States District Court,
D. New Jersey.

Dec. 5, 1991.

---

Michael Chertoff, U.S. Atty. by Alberto Rivas, Kevin McCarthy, Leslie Fay Schwartz, Donna Krappa, Asst. U.S. Attys., Newark, N.J., for plaintiff.

Raymond R. Beam, Jr., Bloomfield, N.J., David Ruhnke, West Orange, N.J., for defendant.

Lawrence S. Lustberg, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for amicus curiae Ass'n of Criminal Defense Lawyers of New Jersey.

## OPINION

HAROLD A. ACKERMAN, District Judge.

Bilal Pretlow, along with eight codefendants, was originally indicted on a variety of charges, including one substantive RICO count and one RICO conspiracy count. Among the racketeering acts alleged for these counts were the murders of Melanie Baker and Mutah Sessoms. On January 18, 1991, the United States filed a superseding indictment which added two further counts against Bilal Pretlow. More specifically, he was charged with intentionally causing the deaths of Melanie Baker and Mutah Sessoms while working in furtherance of a continuing criminal enterprise. Pursuant to 21 U.S.C. § 848(e)(1)(A), the government is entitled to seek the death penalty against Mr. Pretlow on either count. Accordingly, on that same date, the government filed Notices of Intention to seek the death penalty against

Mr. Pretlow on both counts and filed Notices of Aggravating Factors.[1]

Now before the court are a series of motions brought by Mr. Pretlow challenging numerous portions of the death penalty statute. More specifically, he argues that:

1. the statute is unconstitutional because it fails to provide for meaningful appellate review;

2. the non-statutory aggravating factor set forth in the government's Notice of Aggravating Factors must be dismissed because the statute's allowance for non-statutory aggravating factors constitutes an unconstitutional delegation of legislative power and the statute's failure to require proportionality review when non-statutory aggravating factors are considered renders the statute unconstitutional;

3. the statute is unconstitutional because it permits a relaxed evidentiary standard at the penalty phase which renders any finding unreliable;

4. the statute is unconstitutional as applied here because the aggravating factors listed at 21 U.S.C. § 848(n)(1) simply duplicate elements of the capital crimes with which Mr. Pretlow is charged rather than narrow the class of murders for which a death sentence may be imposed;

5. the aggravating factor listed at 21 U.S.C. § 848(n)(12)—that the offense was committed in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim—is unconstitutional both facially and as applied here;

6. the aggravating factor listed at 21 U.S.C. § 848(n)(9)—that the victim was particularly vulnerable due to her youth—is unconstitutional both facially and as applied here;

7. the prohibition against racial discrimination set forth in 21 U.S.C. § 848(*o*) is unconstitutional to the extent that it bars

Mr. Pretlow from presenting relevant mitigating evidence;

8. Mr. Pretlow was arbitrarily singled out for exposure to the death penalty in violation of his fifth and eight amendment rights;

9. the government has vindictively sought the death penalty against Mr. Pretlow because of his refusal to plead guilty and, therefore, should be barred from further pursuing the imposition of that penalty;

10. the statute is unconstitutional because the death penalty constitutes cruel and unusual punishment in all circumstances.

In addition, the Association of Criminal Lawyers of New Jersey ("Association"), which has been granted leave to appear in this matter as *amicus curiae*, raises one additional argument not specifically mentioned by Mr. Pretlow. The Association asserts the statute is unconstitutional because it fails to permit a defendant from offering and the jury from considering the circumstances of the crime as a mitigating factor.[2] Not surprisingly, the government has opposed all of these arguments. I will now discuss each of them in turn.

## I. Meaningful Appellate Review

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court struck down the Georgia and Texas death penalty statutes. Id. at 239, 92 S.Ct. at 2727 (per curiam). Although there was little agreement among the majority as to the scope of its holding, one point of consensus was that the statute in question vested juries with the discretion to impose the death penalty in an arbitrary and capricious manner. See id. at 255–57, 92 S.Ct. at 2734–35 (Douglas, J., concurring: These death penalty statutes provide juries with unfettered discretion and, therefore, have been applied in a discriminatory manner); at 295, 92 S.Ct. at 2755 (Brennan, J., concurring: Imposition of the death pen-

---

**1.** In accordance with 21 U.S.C. § 848(h)(2), the government was later permitted to amend the Notices of Aggravating Factors upon a showing of good cause. See Opinion (Aug. 13, 1991).

**2.** I will consider this argument in conjunction with Mr. Pretlow's argument in Section Seven that the statute prohibits him from presenting mitigating evidence on the effects of any racial discrimination he suffered.

alty constitutes cruel and unusual punishment in part because of its infrequent and arguably arbitrary application.); at 309, 92 S.Ct. at 2762 (Stewart, J., concurring: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."); 313 (White, J., concurring: "[T]here is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."); 364–366 (Marshall, J., concurring: The death penalty is unconstitutional in part because it falls unfairly on the racial minorities and the poor.). After *Furman* was rendered, approximately two-thirds of the states, including both Georgia and Texas, revised their death penalty statutes to correct the constitutional infirmities highlighted by the various Justices. See *Gregg v. Georgia*, 428 U.S. 153, 179 & n. 23, 96 S.Ct. 2909, 2928 & n. 23, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). In a trilogy of Supreme Court cases, the amended statutes of Georgia, Texas, and Florida were challenged and upheld. See *Gregg*, 428 U.S. 153, 96 S.Ct. 2909 (upholding Georgia statute); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (upholding Florida statute); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding Texas statute).

Among the statutory features the Supreme Court emphasized in its opinions upholding these statutes was the presence of "meaningful appellate review." See *Gregg*, 428 U.S. at 166–68, 198, 204–06, 96 S.Ct. at 2922–23, 2936, 2939–41, 49 L.Ed.2d 929 (opinion of Stewart, Powell, and Stevens, JJ.), at 222–225, 96 S.Ct. at 2947–49 (White, concurring in judgment, with whom Burger, C.J., and Rehnquist, J., join); *Proffitt*, 428 U.S. at 250–51, 96 S.Ct. at 2965–70 (opinion of Stewart, Powell, and Stevens, JJ.). Under the Georgia statutory scheme, meaningful appellate review included expedited direct review of a death sentence by the Georgia Supreme Court. In addition to the conventional appellate review available in all criminal cases, the Georgia appellate courts were specifically directed to determine whether or not the death penalty was imposed "under the influence of passion, prejudice, or any other arbitrary factor." *Gregg*, 428 U.S. at 166–67, 96 S.Ct. at 2922–23 (opinion of Stewart, Powell, and Stevens, JJ.). In cases other than those involving treason or aircraft highjacking, the appellate courts were also to consider whether or not the evidence supported the lower court's finding of a statutory aggravating factor. Finally, the appellate courts were to ascertain whether the imposition of the death penalty in the case under review was disproportionate to sentences imposed in other cases. Id. at 167, 96 S.Ct. at 2922. These appellate requirements, Justice Stewart explained, "serve as a check against the random or arbitrary imposition of the death penalty." Id. at 206, 96 S.Ct. at 2940. As such, they "afford additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here." Id. at 207, 96 S.Ct. at 2941; accord id. at 211, 96 S.Ct. at 2942 (White, J., concurring, with whom Burger, C.J., and Rehnquist, J., join).

In subsequent death penalty cases, the Supreme Court has repeatedly reiterated the need for meaningful appellate review. See *Parker v. Dugger*, —— U.S. ——, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."); *Clemmons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 1448, 108 L.Ed.2d 725 (1990) ("[T]his court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency."). At the same time, however, the Court has noted that meaningful appellate review may be accomplished through a variety of statutory schemes. Hence, it has refused to endorse one statutory scheme to the exclusion of all others. See, e.g., *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1983) (Comparative proportionality review by the appellate court which the Court had previously found to be a key part of the Georgia death penalty scheme is not constitutionally required.).

In this case, the death penalty statute at issue has specific provisions for appellate review. In pertinent part, it provides:

(1) In any case in which the sentence of death is imposed under this section, the sentence of death shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time prescribed for appeal of judgment in section 2107 of Title 28. An appeal under this section may be consolidated with an appeal of judgment of conviction. Such review shall have priority over all other cases.

(2) On review of the sentence, the court of appeals shall consider the record, the evidence submitted during trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section.

(3) the court shall affirm the sentence if it determines that—

(A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(B) the information supports the special findings of the existence of every aggravating factor upon which the sentence was based, together with or the failure to find, any mitigating factors as set forth or allowed in this section.

In all other cases, the court shall remand the case for reconsideration under this section. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence.

See 21 U.S.C. § 848(q)(1), (2), & (3). Mr. Pretlow argues that these provisions fail to guarantee "meaningful appellate review" as the Supreme Court has defined that phrase. In fact, he maintains that this statute provides for diminished appellate review because it requires the appellate court to uphold the imposition of a death sentence unless it determines: the informa-

tion presented during the penalty phase was insufficient to support the jury findings regarding aggravating and mitigating factors, or the decision was based on passion, prejudice, or other arbitrary factors. As a result, Mr. Pretlow claims the statute excludes from appellate review various errors of law which could occur during the penalty phase of the trial but do not involve the sufficiency of the evidence and traditionally have not been classified as arbitrary factors.

 If this death penalty statute actually prohibited direct appellate review of arguably reversible errors of law committed during the penalty phase of the trial, this court agrees with Mr. Pretlow that the statute would be unconstitutional. Despite the best intentions of a trial judge and the most meticulous statutory and procedural precautions, few trials are error-free. Inadvertent errors of law which substantially impinge on one party's constitutional rights do occur during the course of a trial, although hopefully infrequently. By their very nature, these harmful errors create a substantial risk that similar cases will be decided inconsistently. Where an appellate court is not permitted to correct such inconsistent results through either direct review of the error or some other means,[3] this risk remains unchanged. Given the uniqueness of the death penalty, however, the Supreme Court has repeatedly explained that this sort of substantial risk cannot be tolerated but instead must be minimized. See generally *Furman*, 408 U.S. 238, 92 S.Ct. 2726 (prohibiting the arbitrary and capricious imposition of the death penalty). Since the errors of law discussed here occur despite the careful attention of a trial court, they cannot in any practical sense be minimized at the trial level. The only alternative is to require appellate courts to minimize the inconsistencies created by such errors on direct review. See, e.g., *Parker*, 111 S.Ct at 739 ("We have held specifically that the

---

**3.** In light of the Supreme Court's admonishment in *Pulley*, 465 U.S. at 45, 104 S.Ct. at 876, that a variety of statutory schemes may be constitutional, this court leaves open the possibility that a statutory scheme containing some other form of appellate review, such as comparative pro-

portionality review, might be sufficient to diminish the inconsistencies which result from harmful errors of law. However, since the statute under examination here does not provide for comparative proportionality review, I need not explore this possibility further.

Florida Supreme Court's system of independent review of death sentences minimizes the risk of constitutional error, and have noted the 'crucial protection' afforded by such review in jury override cases."). Therefore, after careful consideration of *Furman* and its progeny, this court finds that a death penalty statute must provide for the sort of appellate review which would minimize the arbitrariness created by harmful errors of law.

As the foregoing discussion indicates, I essentially agree with Mr. Pretlow that this death penalty statute must provide for direct review of errors of law to be constitutional. However, I disagree with his contention that this statute fails to permit such review. While this court acknowledges that the appellate review provisions of this statute contains imperfections,[4] I believe Mr. Pretlow construes them unnecessarily narrowly so as to render them constitutionally suspect. Therefore, I decline to follow his constricted reading of the appellate review provisions. See *Communications Workers v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988) ("[F]ederal statutes are to be construed so as to avoid serious doubts as to their constitutionality, and that when faced with such doubts the Court will first determine whether it is fairly possible to interpret the statute in a manner that renders it constitutionally valid."); *DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

Instead, I construe these provisions as permitting appellate review of harmful errors of law. Section 848(q)(3)(A) requires an appellate court to remand any case where it finds a death sentence "imposed

under the influence of ... any other arbitrary factor." An error of law during the penalty phase of the trial which is found to be harmful must by definition be one which prejudiced the defendant by ultimately affecting either the record for the jury's consideration or the jury deliberations themselves. In either case, it means the jury's decision was not rendered in accordance with the law but rather was partially based on some impermissible factor. I believe such impermissible factors fall within the scope of the "arbitrary factors" as that term is used in Section 848(q)(3)(A).

When the appellate review provisions of this statute are appropriately construed, I find that they clearly encompass the essential elements of "meaningful appellate review" as envisioned by the Supreme Court. More specifically, the provisions clearly provide for conventional appellate review, including review of all errors of law. In addition, they direct the appellate court to consider whether or not the evidence supports the specific findings on which the death sentence rests. They also require the reviewing court to determine if the decision to impose the death sentence was affected by passion, prejudice, or other arbitrary factors. With the exception of requiring proportionality review, which the Supreme Court has found is not an essential element of a death penalty scheme, these appellate review provisions provide essentially the same scope of review as those approved by the Court in *Gregg*. Compare 21 U.S.C. § 848(q)(1), (2), & (3) with *Gregg*, 428 U.S. at 166–67, 96 S.Ct. at 2922. Accordingly, I deny Mr. Pretlow's motion to declare this statute unconstitutional on the ground that it fails to provide for "meaningful appellate review."

II. Constitutionality of the Non-statutory Aggravating Factor

Pursuant to section 848(h)(1)(B), the government must notify the defendant of those aggravating factors which it will

4. Such imperfections are probably the result of the haste in which this statute was enacted by Congress. See Committee on Criminal Law, Federal Death Penalty Legislation in the Record of the Proceedings of the Bar of the City of New York 619–22 (1990) (noting that the statute was enacted without prior consideration by any legislative committees and that its legislative history consists of "nothing more than a handful of debates on the Senate floor").

seek to prove as its basis for the death penalty. These aggravating factors may include the statutory factors set forth in section 848(n) as well as any other non-statutory factors on which the government will rely. In this case, the government has notified Mr. Pretlow that it will attempt to prove one non-statutory aggravating factor in addition to several statutory ones as its basis for seeking the death penalty against him on the Mutah Sessoms' homicide count. The non-statutory aggravating factor is that Mutah Sessoms was killed "to prevent [him] from cooperating as a witness in a criminal investigation into [Mr. Pretlow's] continuing criminal enterprise." See Superseding Notice of Aggravating Factors (Count Five) ¶ 9. Mr. Pretlow attacks the government's use of this non-statutory aggravating factor on two grounds: First, he contends that the provision permitting non-statutory aggravating factors must be struck down because it constitutes an impermissible delegation by Congress of legislative power to the Executive branch. Second, he argues that the statute's failure to provide for proportionality review in conjunction with the use of non-statutory aggravating factors renders it unconstitutional. I will address both arguments in turn.

## A. The Non–Delegation Doctrine

■ The United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. 1, § 1. Interpreting this provision in light of the principle of separation of powers, the Supreme Court has held that it prohibits Congress from delegating its entire legislative power to another branch of government. See *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989). Yet, the Supreme Court also has recognized that Congress often requires the assistance and expertise of these other branches to fulfill its functions in an increasingly complex society. Id. Accordingly, the Court has found that the Constitution permits a flexible and pragmatic resolution to what might otherwise be an inextricable dilemma: "So long as Congress 'shall lay down by legislative act an intelli-

gible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" Id. at 372, 109 S.Ct. at 654 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)).

Mr. Pretlow argues that the provision of the federal death penalty statute which permits the government to assert non-statutory aggravating factors does not comply with this standard. Put differently, he contends that Congress has not provided the Executive Branch with an intelligible principle to guide and limit prosecutorial discretion in choosing non-statutory aggravating factors. Of course, his argument presumes that the identification of all aggravating factors is solely a legislative function, a point which the government vigorously contests. Therefore, I will first address this latter point before turning to the issue of whether or not an improper delegation occurred.

■ In *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), a case in which the Supreme Court upheld the congressional delegation of power to a commission within the judiciary to promulgate the new Federal Sentencing Guidelines, the Court discussed the traditional roles held by each branch of government in the federal sentencing process. It explained:

Historically, federal sentencing—the function of determining the scope and extent of punishment—never has been thought to be assigned by the Constitution to the exclusive jurisdiction of any one of the three Branches of Government. Congress, of course, has the power to fix the sentence for a federal crime, and the scope of judicial discretion with respect to a sentence is subject to congressional control. Congress early abandoned fixed-sentence rigidity, however, and put in its place a system of ranges within which the sentencer could choose the precise punishment. Congress delegated almost unfettered discretion to the sentencing judge to determine what

the sentence should be within the customarily wide range so selected. This broad discretion was further enhanced by the power later granted the judge to suspend the sentence and by the resulting growth of an elaborate probation system. Also, with the advent of parole, Congress moved toward a "three-way sharing" of sentencing responsibility by granting corrections personal in the Executive Branch the discretion to release a prisoner before the expiration of the sentence imposed by the judge. Thus, under the indeterminate sentence system, Congress defined the maximum, the judge imposed a sentence within the statutory range (which he usually could replace with probation), and the Executive Branch's parole official eventually determined the actual range of imprisonment. Id. at 364–65, 109 S.Ct. at 650–51 (citations omitted). Relying primarily on this description of the sentencing functions customarily ascribed to each branch, the government argues that the Executive Branch has the inherent power to raise relevant non-statutory aggravating factors to the jury. In other words, it contends that the statute's recognition that the prosecutor may assert additional non-aggravating factors to the jury upon notice to the defendant did not constitute a delegation of any legislative authority to the Executive Branch.[5] I disagree.

The government has simply misread the *Mistretta* passage. While the Court in *Mistretta* indicates that all three branches were involved in the sentencing process, it explicitly states that the roles of the Executive and Judicial Branches were based on and, hence, derived from legislative power. See, e.g., id. at 364, 109 S.Ct. at 650 ("Congress *delegated* almost unfettered discre-

tion to the sentencing judge.... Congress moved toward a 'three-way sharing' of sentencing responsibility *by granting* corrections personnel in the Executive Branch the discretion to release a prisoner....") Put differently, the Court stated that the power shared was power belonging to Congress.

A review of the Constitution itself clearly supports this interpretation of *Mistretta*. The Constitution, upon which all federal power is ultimately based, explicitly divides the duties and responsibilities of the federal government among the three branches. For the government's argument that the Executive Branch has the inherent authority to identify non-statutory aggravating factors to be correct, the authority must be based on some power in the Constitution which is specifically allotted to the Executive. Interestingly, the government has not and, arguably, cannot point to any provision in the Constitution upon which the Executive Branch's "inherent sentencing authority" is based. By contrast, the Constitution expressly grants Congress the duty to define and punish certain crimes. See, e.g., U.S. Const. art. I., § 8 (to define and punish piracies, counterfeiting, felonies on the high seas, and offenses against the laws of nations), art. III., § 3 (to declare the punishment for treason). In addition, the Constitution also grants Congress the power to make all laws "necessary and proper" to execute its enumerated powers, which includes the power to enforce its laws with criminal penalties. See id. art. I., § 8; *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) ("Congress has the power to define criminal punishments without giving the courts any sentencing discretion."); *United States v. Wiltberger*, 5 Wheat. 76, 95, 5 L.Ed. 37 (1820) ("It is the legislature,

---

**5.** The government also points out that once a jury has determined that a defendant belongs to a class of individuals to whom the death penalty is applicable, the Constitution permits it to consider non-statutory aggravating factors when deciding whether to apply the death sentence to him. See *Zant v. Stephens*, 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983) ("But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among

that class those defendants who will actually be sentenced to death."); *Barclay v. Florida*, 463 U.S. 939, 956–57, 966–67, 103 S.Ct. 3418, 3428–29, 3433–34, 77 L.Ed.2d 1134 (1983). However, while the government's contention is correct, it does not resolve the issue of whether or not the statute's provision constitutes a delegation. The Constitution permits many things, but not all of them may be accomplished by every branch of government.

not the court, which is to define a crime, and ordain its punishment."). Therefore, the statute's provision which permits a federal prosecutor to identify and raise non-statutory aggravating factors to a jury must constitute a delegation of legislative authority.

■ Having determined that a delegation of legislative authority occurred, I now turn to whether or not the delegation was proper. As previously noted, a delegation must be accompanied by an "intelligible principle" to be constitutional.[6] However, in *Mistretta*, 488 U.S. 361, 109 S.Ct. 647, the court made clear that an intelligible principle need only set forth the broad parameters within which another branch has the discretion to act. Id. at 371–79, 109 S.Ct. at 654–58; see also *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (The constitutionality of a delegation "depends not upon the breadth of the definition of the facts or conditions upon which the administrative officer is to find but upon the determination whether the definition sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will."). Indeed, in *Mistretta*, 488 U.S. 361, 109 S.Ct. 647, the court specifically acknowledged and approved a broad delegation of legislative authority to both the judicial and the executive branches with respect to sentencing. Id. at 364–65, 109 S.Ct. at 650–51 (acknowledging the "almost

unfettered discretion" traditionally delegated to judicial and executive branches to determine sentences), at 377–78, 109 S.Ct. at 657–58 (although the delegation to a judicial commission to determine federal sentencing guidelines carried with it substantial discretion on policy matters, it was proper).

Judged against the "intelligible principle" standard, I find that the delegation at issue here is proper. The statute permits a federal prosecutor to identify and raise during the penalty phase of a trial those non-statutory aggravating factors upon which it has previously notified the defendant it would rely. Although this provision admittedly provides a federal prosecutor with broad discretion to determine what the non-statutory aggravating factors are, this discretion has boundaries. Supreme Court precedent limits the scope of aggravating factors to the circumstances of the crime or the characteristics of the defendant. See, e.g., *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983); see also *Lichter v. United States*, 334 U.S. 742, 786, 68 S.Ct. 1294, 1317, 92 L.Ed. 1694 (1948) (collecting cases of comparable legislative specifications). Moreover, upon an appropriate motion, the relevance and constitutionality of any proposed non-statutory aggravating factor may come under judicial scrutiny. See *Touby*, 111 S.Ct. at 1758–59 (Marshall, J., concurring: "[J]udicial review perfects a delegated-lawmaking scheme by assuring

---

**6.** Mr. Pretlow contends that the Supreme Court has recently raised the requirements needed for a constitutional delegation of legislative authority concerning criminal matters. In *Touby v. United States*, — U.S. ——, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991), he explained, the Court noted that a delegation which authorizes the Executive Branch to promulgate regulations essentially criminalizing certain activities may require greater congressional specificity due to the heightened threat to individual liberty. Although the Court refrained from deciding whether a stricter standard was constitutionally required, it explicitly concluded the statute in question would pass muster even under a stricter standard. Id. 111 S.Ct. at 1756. Therefore, Mr. Pretlow contends that this court should judge this delegation against a heightened standard requiring greater congressional specificity.

I disagree. Even if the Court has adopted a stricter standard for delegations analogous to the one in *Touby*, the delegation here is distinguishable. In *Touby*, the delegated authority permitted an administrative agency to redefine certain non-criminal activity as criminal. By contrast, the acts allegedly committed by Mr. Pretlow have already been criminalized by statute. Moreover, the maximum penalty for these acts—that is, death—also has been set by statute. Even this maximum penalty may not be imposed unless the jury finds at least two *statutory* aggravating factors exist. Therefore, unlike the *Touby* delegation, the delegation here does not define either the criminal activity or the class of defendants eligible for the maximum punishment. Instead, it simply provides the prosecutor with the authority to present case-specific aggravating factors to the jury for its consideration.

that the exercise of such power remains in statutory bounds."). The statute itself limits a prosecutor to those non-statutory aggravating factors about which he has given notice to the defendant. Together, these limitations provide an intelligible principle against which a prosecutor's exercise of discretion may be judged. Accordingly, the delegation of legislative authority is constitutional.

### B. Non-Statutory Aggravating Factors and Proportionality Review

■ Proportionality review, as the term is commonly used in death penalty cases, requires an appellate court to determine whether or not the imposition of the death penalty is arbitrary or capricious in one case by comparing it to the sentences imposed in similar cases. See *Pulley v. Harris*, 465 U.S. 37, 43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). Intended to ensure the consistent application of the death penalty, proportionality review has been uniformly praised by the Supreme Court. See, e.g., *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2749, 77 L.Ed.2d 235 (1983); *Gregg*, 428 U.S. at 203, 222, 96 S.Ct. at 2939, 2947. Nevertheless, despite its words of approval, the Court concluded in *Pulley*, 465 U.S. 37, 104 S.Ct. 871, that nothing in the Constitution requires appellate courts to conduct proportionality review in every case where the death penalty is imposed. See id. at 50–51, 104 S.Ct. at 879–80. Indeed, although the Court acknowledged that "there could be sentencing systems so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review," the clear implication of *Pulley* is that such cases would comprise the exception rather than the rule. Id. at 51, 104 S.Ct. at 879.

Not surprisingly, Mr. Pretlow contends that the mechanics of the death penalty statute at issue here provide one of those rare occasions when proportionality review is constitutionally required. More specifically, he argues that the discretion the statute affords the federal prosecutor to identify and raise non-statutory aggravat-

ing factors to the jury during the penalty phase of the trial impermissibly increases the risk that the death penalty will be applied in an arbitrary and capricious manner. See generally *Furman*, 408 U.S. 238, 92 S.Ct. 2726 (prohibiting the arbitrary and capricious imposition of the death penalty). To effectively neutralize this increased risk, he contends that an appellate court must conduct some form of proportionality review.

In making this argument, Mr. Pretlow relies heavily on *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The defendant in *Zant* had been sentenced to death by the jury after it has found the facts and circumstances presented during the sentencing hearing supported three statutory aggravating factors enumerated in the Georgia death penalty statute. While Zant's case was on appeal, however, the Georgia Supreme Court ruled in another case that one of the three statutory aggravating factors on which Zant's death sentence was based was unconstitutionally vague. In light of its ruling, the court then considered on its own motion whether or not Zant's death sentence was constitutionally compromised by the invalidation of one of the three statutory aggravating factors on which the sentence rested. The Georgia court found it was not and the Supreme Court agreed.

In approving the Georgia court's decision, the Supreme Court focused primarily on three features of the Georgia statutory scheme. First, it found that the statutory aggravating factors served only to narrow the class of defendants eligible for the death penalty. In other words, a Georgia jury could not impose the death penalty unless it found proof of at least one statutory aggravating factor. In *Zant*, the jury had originally found three statutory aggravating factors, two of which the Georgia Supreme Court specifically upheld. These two, the Court emphasized, were sufficient to support Zant's sentence. Second, the Court concluded that both the Constitution and the Georgia statute permitted consideration of non-statutory aggravating factors to determine whether or not the death pen-

alty should be imposed on a death-eligible defendant. Since the evidence submitted to support the invalid statutory aggravating factor did not involve constitutionally-protected conduct, it was admissible for consideration as a non-statutory aggravating factor by the jury. Third, the Court noted that the Georgia Supreme Court's compliance with the Georgia statute's provision for mandatory appellate review, including proportionality review, ensured that Zant's death sentence had not been arbitrarily imposed.

Mr. Pretlow concedes the *Zant* Court found that the Constitution permits a jury to consider non-statutory aggravating factors when deciding whether a defendant eligible for the death penalty should be sentenced to death. However, he argues that the *Zant* Court's conclusions should be limited to the factual context in which they arose. Put differently, he argues that the constitutionality of permitting a jury to consider non-statutory aggravating factors is conditional on the presence of the other safeguards emphasized by the *Zant* Court, the most crucial of which he believes was proportionality review.

Although this court has no doubt that proportionality review provides a significant safeguard against the inconsistent and arbitrary application of the death penalty and, thereby, improves any death penalty statute of which it is a part, I do not believe Supreme Court precedent dictates that such review must be incorporated in the statute at issue here. As previously noted, less than one year after *Zant* was decided, the Supreme Court held in *Pulley* that proportionality review was not required whenever a death sentence was imposed. In reaching this conclusion, the Court elaborated on the meaning of *Zant.* It explained:

> While emphasizing the importance of mandatory appellate review under the Georgia statute, we did not hold [in *Zant*] that without comparative proportionality review the statute would be unconstitutional. To the contrary, we relied on the jury's finding of aggravating circumstances, not the State Supreme Court's finding of proportionality, as ra-

tionalizing the sentence. Thus, the emphasis was on the constitutionally necessary narrowing function of statutory aggravating circumstances. Proportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required.

*Pulley,* 465 U.S. at 50, 104 S.Ct. at 879 (citations omitted). In light of this passage, I do not believe that *Zant* can be construed as requiring proportionality review whenever a jury is permitted to consider non-statutory aggravating factors. Nor do I believe that the Constitution, as it is presently interpreted by the Supreme Court, requires proportionality review where other forms of appellate review are adequate to address the risk created by jury consideration of non-statutory aggravating factors. See *Pulley,* 465 U.S. at 44–45, 104 S.Ct. at 876 ("[T]hat some schemes providing proportionality review are constitutional does not mean that such review is indispensable.... To endorse the statute as a whole is not to say that anything different is unacceptable."). This court has construed the appellate review provisions of this statute to require review of any error of law occurring during the sentencing phase of the trial as well as review of the sufficiency of the evidence supporting the death sentence. In addition, the statute provides that an appellate court must determine whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Together, these provisions help ensure that the discretion afforded the prosecutor to raise non-statutory aggravating factors and the discretion afforded the jury to consider them does not create a substantial risk that the death penalty will be inconsistently applied. Such assurances are all the Supreme Court and, hence, the Constitution appear to require.

III. The Evidentiary Standard for the Sentencing Hearing

The procedures and evidentiary standard governing the sentencing hearing

are set forth in 21 U.S.C. § 848(j) which provides in pertinent part:

In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in subsections (m) or (n) of this section, or any other mitigating factor or any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this subsection. Where information is presented relating to any of the aggravating factors set forth in subsection (n) of this section, information may be presented relating to any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. *Any other information relevant to such mitigating or aggravating factors may be presented by either the government or the defendant, regardless of its admissibility under the rules of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.*

Id. (emphasis added). Mr. Pretlow concedes that the evidentiary standard described here is patterned after that used in more routine sentencing hearings. However, he argues that a death sentence is not routine. Rather, as the Supreme Court has repeatedly acknowledged, the death penalty is a qualitatively different type of sentence which requires heightened procedural safeguards to ensure its imposition is both fair and consistent. See, e.g., *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Instead of strengthening the procedural safeguards, however, Mr. Pretlow contends this provision permits the sentencing hearing to be transformed into an "evidentiary free-for-all" where, for example, admission of hearsay evidence would be able to seriously undermine a defendant's sixth amendment right to confront those witnesses against him. Accordingly, he argues this court should find the statute unconstitutional.

Although Mr. Pretlow makes some interesting and facially appealing points, I believe his argument has been considered and rejected by the Supreme Court. Indeed, in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the court refused to require restrictive evidentiary standards at sentencing hearings, even when the possible penalty was death. The Court explained:

Highly relevant—if not essential—to [a judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

Id. at 247, 69 S.Ct. at 1083 (footnote omitted); see also id. at 251, 69 S.Ct. at 1085 ("It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed. We cannot accept the contention."). Although *Williams* was decided prior to *Furman*, 408 U.S. 238, 92 S.Ct. 2726, at a time when juries were permitted much more discretion in sentencing a defendant to death, the Court has approved of its holding in several post-*Furman* cases. For instance, in *Gregg*, 428 U.S. 153, 96 S.Ct. 2909, the Court echoed its conclusions in *Williams* when it rejected the defendant's argument that the evidentiary standard employed during sentencing hearings was unduly lenient:

So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

Id. at 203–04, 96 S.Ct. at 2939 (opinion of Stewart, Powell, and Stevens, JJ.). One

year later in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Court distinguished rather than overruled *Williams* when it held that the failure to disclose to a defendant during a sentence hearing all information upon which a death sentence is ultimately based violates the defendant's due process rights. Id. at 355–57, 97 S.Ct. at 1203–04. Finally, in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of the Court specifically relied on *Williams* to support its holding that a defendant in a death penalty case cannot be precluded from raising any mitigating factors. Id. at 602–04, 98 S.Ct. at 2963–64 (opinion of Burger, C.J., with whom Stewart, Powell, and Stevens, JJ., joined.).

The evidentiary standard set forth in Section 848(j) is consistent with these precedents. It permits a wide range of information relevant to either aggravating or mitigating factors to be presented to the jury during the penalty phase of the trial regardless of the information's admissibility under the Federal Rules of Evidence. However, this standard also provides some limits on the scope of relevant information by requiring the trial court to exclude from jury consideration any information for which the probative value is substantially outweighed by the risk of unfair prejudice to the defendant or the risk that it would confuse the issues or mislead the jury. Compare with *Gregg*, 428 U.S. at 203–04, 96 S.Ct. at 2939–40. Although this standard would not exclude most hearsay evidence as effectively as would Federal Rule of Evidence 802, it does provide Mr. Pretlow with some assurance that the information presented meets a minimum threshold of reliability. Put differently, to determine the probative value or risk of unfair prejudice associated with any information, this court must consider its reliability.[7] Therefore, this court concludes the evidentiary

standard set forth in this statute is adequate to meet constitutional demands.

## IV. Aggravating Factors Which Duplicate Elements of the Offense

■ The death penalty statute defines the class of individuals eligible for the death penalty as:

> [A]ny person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills, or counsels, commands, procures, or causes the intentional killing of an individual and such killing results....

21 U.S.C. § 848(e)(1)(A). Pursuant to this provision, Mr. Pretlow has been charged with the capital murders of Melanie Baker and Mutah Sessoms. Moreover, among the aggravating factors alleged by the government for each capital count is that Mr. Pretlow "intentionally killed" both victims. See Superseding Notice of Aggravating Factors (Count Four); Superseding Notice of Aggravating Factors (Count Five). It is clear to both parties as well as to this court that these aggravating factors duplicate elements of the capital offenses charged. Mr. Pretlow contends that such duplication renders the statute unconstitutional. The government disagrees. However, both parties acknowledge that resolution of this issue is dependent on *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

In *Lowenfield*, the defendant was convicted of three counts of first degree murder and sentenced to death for each one. An essential element underlying each conviction was that the defendant "intended 'to kill or inflict great bodily harm upon more than one person.'" Id. at 233, 108 S.Ct. at 548 (quoting Louisiana statute). Furthermore, the sole statutory aggravating factor on which two of the three death sentences were based was that he "know-

---

**7.** Hearsay evidence which determined to be highly unreliable cannot provide particularly probative support for an aggravating factor and may present a significantly increased risk of unfair prejudice due to its superficial credibility. To ensure that Mr. Pretlow has an adequate opportunity to present any objections he may have to this sort of information, this court requires the government to provide Mr. Pretlow and this court with reasonable notice of its intent to present to the jury any information which would be considered hearsay under the Federal Rules of Evidence. Of course, the government is also encouraged to seek an early ruling on any other information it considers potentially problematic.

ingly creat[ed] a risk of death or grievous bodily harm to more than one person."[8] Id. at 234, 108 S.Ct. at 549 (quoting Louisiana statute). Beginning with the premise that statutory aggravating factors were constitutionally required to narrow the class of defendants eligible for the death penalty, the defendant contended his death sentences should be reversed because one aggravating factor on which his sentences were based substantially duplicated an element of the offenses of which he was convicted and, therefore, did not narrow the class of death-eligible defendants at all.

The Supreme Court disagreed. Although it acknowledged that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty' " to pass constitutional muster, see id. at 244, 108 S.Ct. at 554 (quoting *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742), it held that this goal could be achieved in either of two ways: "The legislature may itself narrow the definition of capital offenses, ... so that the jury finding of guilty responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." Id. 484 U.S. at 246, 108 S.Ct. at 555. In *Lowenfield*, the Court found the legislature employed the first method such that the constitutionally-required narrowing function was fulfilled by the jury findings at the guilt, and not the sentencing, phase of the trial. Accordingly, the Court concluded "the fact that the aggravating circumstance duplicated one of the elements of the crime [did] not make this sentence constitutionally infirm."

Mr. Pretlow argues that this case is distinguishable from *Lowenfield* in a key respect: Unlike the statutory scheme reviewed in *Lowenfield*, he contends the statute at issue here is "clearly one where the aggravating factors perform the narrowing function." I partially disagree. This statute narrows the class of death-eligible defendants at two stages. Similar to its statutory counterpart in *Lowenfield*, it initially narrows the class of death-eligible defendants at the guilt phase by limiting the class to those individuals who intentionally kill or otherwise cause another to be killed while engaged in the furtherance of a continuing criminal enterprise. According to the Court in *Lowenfield*, this is all the Constitution requires. However, this statute further narrows the class by requiring a jury at the sentencing phase to find an additional statutory aggravating factor before it may impose the death penalty. See 21 U.S.C. § 848(k). Therefore, unlike the death sentences in *Lowenfield*, a death sentence imposed pursuant to this statute cannot be based solely upon a single statutory aggravating factor which duplicates an element of the underlying offense.[9]

Mr. Pretlow also notes that the statute here is distinguishable from that in *Lowenfield* because it requires the jury as a final step in the penalty process to weigh any aggravating factors it finds against any mitigating ones. This difference, he contends, has constitutional significance. When the jury is permitted to consider an aggravating factor which simply duplicates an underlying element of the offense for which the defendant has already been convicted, the balancing process becomes unfairly skewed toward the imposition of the death penalty and, thereby, is rendered unconstitutional. Again, I disagree. Once a jury has determined a defendant is eligible for the death penalty, many death penalty statutes permit the jury to consider any

---

**8.** The third death sentence was supported by this statutory aggravating factor and one other.

**9.** The two-stage narrowing process codified in this statute also helps allay a concern Justice Marshall raised in his *Lowenfield* dissent. Justice Marshall feared that Court's decision allowing the narrowing function to be relegated to the guilt phase of the trial permitted the sentencing jury "to believe the [defendant's] eligibility for the death penalty was already estab-

lished by their findings during the guilt phase— findings arrived at without any contemplation of their implication for [defendant's] sentence." Id. 484 U.S. at 257, 108 S.Ct. at 561. The result would be to "inevitably tilt the sentencing scales toward the imposition of the death penalty." Here, the statute prohibits any conclusion about a defendant's eligibility until further statutory aggravating factors are considered by the jury during the sentencing process.

non-statutory aggravating factor supported by the facts and circumstances of the case to determine if the death penalty ultimately should be imposed. See, e.g., *Zant*, 462 U.S. at 878–79, 103 S.Ct. at 2742–43; *Gregg*, 428 U.S. at 196–97, 96 S.Ct. at 2935–36. By contrast, this statute limits the jury to considering only those aggravating factors on which the defendant was previously notified the prosecutor would rely. See 21 U.S.C. § 848(h)(1)(B). Thus, in one sense, this statute restricts the jury's ability to consider aggravating factors more than many other death penalty statutes. In addition, the statute permits the defendant to raise as many mitigating factors as he believes are relevant. See infra at 775–776. Finally, regardless of the number of aggravating factors found, a jury is never required to impose the death penalty and will be so instructed. Therefore, although the duplication by an aggravating factor of an element of the underlying crime may be unfortunate, I do not believe it impermissibly skews the balancing process. Accordingly, I deny Mr. Pretlow's motion.

## V. Statutory Aggravating Factor (n)(12)

██ One of the aggravating factors set forth in the death penalty statute is that the defendant "committed the offense in an especially heinous, cruel, or depraved way in that it involved torture or serious physical abuse to the victim." See 21 U.S.C. § 848(n)(12). The government has notified Mr. Pretlow it will rely on this factor, among others, to support the imposition of the death penalty for the capital murder of Mutah Sessoms. See Superseding Notice of Aggravating Factors (Count Five). Mr. Pretlow contends, however, that this aggravating factor is unconstitutionally vague on its face and as applied. I will address each argument in turn.

To support his argument that this aggravating factor is vague on its face, Mr. Pretlow devotes a great deal of attention to meaning of "especially heinous, cruel, or depraved." He correctly notes that, without further limiting instructions, aggravating factors which are restricted to such language have been considered unconstitu-

tionally vague. See *Shell v. Mississippi*, —— U.S. ——, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Maynard v. Cartwright*, 486 U.S. 356, 363–66, 108 S.Ct. 1853, 1859–60, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428, 435, 100 S.Ct. 1759, 1765, 1768, 64 L.Ed.2d 398 (1980). The aggravating factor at issue here, however, is not confined to such language. Rather, the language that the offense was committed in an "especially heinous, cruel, or depraved way" is modified by the language *"in that it involved torture or serious physical abuse to the victim."* See 21 U.S.C. 848(n)(12) (emphasis added). Construing a substantially similar aggravating factor, the Supreme Court held that this last clause, when properly interpreted as requiring evidence that the victim was seriously abused prior to his or her death, clarified the preceding language to the extent the aggravating factor was no longer facially vague. See *Godfrey*, 446 U.S. at 431, 100 S.Ct. at 1766 (opinion of Stewart, J., with whom Powell, Blackmun, and Stevens, JJ., joined), at 437, 100 S.Ct. at 1769 (Marshall, J., concurring, with whom Brennan, J., joined); see also *Maynard v. Cartwright*, 486 U.S. 356, 364–65, 108 S.Ct. 1853, 1859–60, 100 L.Ed.2d 372 (1988) (Limiting the construction of heinous, atrocious, or cruel aggravating circumstances to those involving torture or serious physical abuse of a murder victim is constitutionally acceptable). In light of this precedent, this court finds that this aggravating factor is facially valid to the extent that it requires proof that Mr. Pretlow subjected Mutah Sessoms to serious physical abuse prior to his death. See *United States v. Cooper*, 754 F.Supp. 617, 623 (N.D.Ill.1990) (upholding same aggravating factor). I will so instruct the jury. See *Godfrey*, 446 U.S. at 437, 100 S.Ct. at 1769 (Marshall, J., concurring, requires explanatory instruction to be read to the jury).

Mr. Pretlow also claims this aggravating factor is unconstitutional as applied to the facts of this case. After reviewing the small amount of information received by this court thus far, I am not prepared to find as a matter of law that there is no

factual basis on which this aggravating factor can rest. Of course, Mr. Pretlow may raise this issue again at the close of the government's case when the evidentiary record is more substantial.

## VI. Statutory Aggravating Factor (n)(9)

■ Melanie Baker was fifteen years old when she was killed instantly by gunshots to the head. In seeking the death penalty against Mr. Pretlow for her murder, the government has notified him that it intends to prove, as a statutory aggravating factor, that she was "particularly vulnerable due to her youth." See Superseding Notice of Aggravating Factors (Count Four). Mr. Pretlow contends once again that this factor is unconstitutionally vague on its face and as applied.

To support his claim that this statutory aggravating factor is facially vague, Mr. Pretlow focuses on the meaning of "particularly vulnerable." Such language, he argues, defies definition and limitation. This court need not debate the point because the language "particularly vulnerable" stands not in isolation, but is further modified by the language "due to her youth." In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court found that the "youth" of the defendant constituted a relevant mitigating circumstance. It explained:

> [Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults....
>
> ... [J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing.

*Id.* at 115–116, 102 S.Ct. at 877 (citations omitted). If the "youth" of a defendant is considered sufficiently definite to serve as a relevant mitigating circumstance, this court sees no reason why the "vulnerability of the victim due to her youth" is not equally permissible as an aggravating one. Therefore, I conclude this factor is not facially vague.

Mr. Pretlow also contends that this statutory factor is unconstitutional as applied to this case. Melanie Baker, he argues, was killed instantly by gunshots to the head, allegedly because she had inadvertently discovered a stash house maintained by Mr. Pretlow and his co-conspirators. Accordingly, he concludes there is nothing about these circumstances which suggest her death was in any way prompted by her age or youth. Conversely, he does believe the facts indicate an older person would have been less vulnerable to the harm she suffered. After analyzing the scanty information thus far before me in light of the Supreme Court's description of "youth," I am presently unable to conclude as a matter of law that there is no factual basis for this aggravating factor. Of course, Mr. Pretlow should feel free to raise this issue again at the close of the government's case.

## VII. Mitigating Factors

To pass constitutional muster, the Supreme Court has repeatedly required that a death penalty statute permit a defendant to raise and the jury to consider, as mitigating factors, any aspect of either the defendant's character or the circumstances of the offense in order to pass constitutional muster. See *Penry v. Lynaugh*, 492 U.S. 302, 319–28, 109 S.Ct. 2934, 2947–52, 106 L.Ed.2d 256 (1989); *Summer v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12, 102 S.Ct. 869, 874–75; *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1977). Both Mr. Pretlow and the *amicus curiae* argue that this statute fails to provide such opportunities. More

specifically, they contend that the prohibition against racial discrimination contained in the statute prevents Mr. Pretlow from raising and the jury from considering as a mitigating factor that he has been subject to pervasive racism during the course of his life. *Amicus curiae* also argues that the statute fails to allow consideration of the circumstances of the underlying crimes as a mitigating factor. I will address these arguments in turn.

### A. *The Prohibition Against Racial Discrimination*

■ In *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the defendant challenged his death sentence on the grounds that the Georgia death penalty sentencing process was administered in a racially discriminatory manner in violation of his eighth and fourteenth amendment rights. To support his claims, the defendant proffered a complex statistical study which indicated the existence of a disparity in the imposition of Georgia's death penalty based on the race of the murder victim and, to a lesser extent, the race of the defendant. Id. at 286–87, 107 S.Ct. at 1763–64 (describing study). Although the Court acknowledged the serious concerns raised by this study, it ultimately affirmed the defendant's conviction. After addressing the constitutional arguments, the Court concluded its opinion by noting:

> McCleskey's arguments are best presented to the legislative bodies. It is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes. It is the legislatures, the elected representatives of the people, that are "constituted to respond to the will and consequently the moral values of the people." ... Legislatures also are better qualified to weigh and "evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts."

Id. at 318, 107 S.Ct. at 1781 (citations omitted).

Possibly in response to the Court's comments in *McCleskey,* Congress included in the death penalty statute at issue here a prohibition against discrimination. More specifically, the statute requires a trial court to instruct the sentencing jury:

> [T]hat in its consideration of whether the sentence of death is justified it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or the victim may be.

21 U.S.C. § 848(*o*)(1). After completion of all deliberations, the statute also requires each member of the sentencing jury to sign a certification stating that he or she complied with these instructions. Id. Finally, the statute required the Comptroller General to conduct several studies focusing on the influence of racial factors in sentencing decisions. Id. § 848(*o*)(2).

As previously noted, Mr. Pretlow, who is black, contends that this prohibition prevents him from presenting information concerning the impact racial discrimination on him and, therefore, renders the statute unconstitutional. I assume without now deciding that such information would constitute a relevant mitigating factor. Accordingly, the statute would be unconstitutional if it actually prohibit jury consideration of this factor. However, I do not believe the statute need be construed in this manner. Although the provision is not a model of skillful draftmanship, see supra note 4, I believe the intent of Congress is nevertheless clear: It is to prohibit juries from considering impermissible factors, such as the race of the defendant or victim, as ones which in any way favor the imposition of the death penalty. See *Cooper,* 754 F.Supp. at 624 (finding similarly). Therefore, I do not construe this provision as prohibiting either the presentation to or consideration by the jury of any information involving the impact of racial discrimination on Mr. Pretlow. See *Communications Workers v. Beck,* 487 U.S. 735, 762,

108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988) ("[F]ederal statutes are to be construed so as to avoid serious doubts as to their constitutionality, and that when faced with such doubts the Court will first determine whether it is fairly possible to interpret the statute in a manner that renders it constitutionally valid."); *DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397 ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

### B. *Circumstances of the Crime*

 The death penalty statute provides that the jury must "consider mitigating factors, including" ten statutory ones. See 21 U.S.C. § 848(m). None of the specified statutory mitigating factors, however, involve the circumstances of the crime. Therefore, *amicus curiae* contends that the statute prohibits the introduction and consideration of such circumstances as mitigating factors in violation of Mr. Pretlow's constitutional rights.

I disagree. The statutory mitigating factors set forth in section 848(m) are clearly not intended to be exhaustive. By its very terms, section 848(m) requires the jury to consider mitigating factors *including* the statutory ones specified. Contrast with id. § 848(n) ("the following aggravating factors are the only aggravating factors that shall be considered"). Section 848(j) further buttresses this open-ended interpretation of section 848(m) by explicitly permitting the introduction of information relating to non-statutory mitigating factors. See id. § 848(j) ("In the sentencing hearing, information may be presented as to matters relating to any of the ... mitigating factors set forth in subsection (m) ... of this section, or *any* other mitigating factor...."). Accordingly, I find that *amicus curiae*'s contention that this statute precludes consideration of mitigating factors relating to the circumstances of

Mr. Pretlow's alleged crimes is meritless. See *Cooper*, 754 F.Supp. at 624.

### VIII. Selective Prosecution

 The government is generally afforded wide discretion as to whom to prosecute. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests in his [or her] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978); accord *McCleskey*, 481 U.S. at 296, 107 S.Ct. at 1768; *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). However, such prosecutorial discretion must be exercised within constitutional bounds. Put differently, a decision to prosecute may not be based on any impermissible factors such as race, religion, or some other arbitrary reason. See *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531; *United States v. Schoolcraft*, 879 F.2d 64, 68 (3rd Cir.1989), cert. denied, 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989); *Government of Virgin Islands v. Harrigan*, 791 F.2d 34, 36 (3rd Cir.1986).

To successfully demonstrate that prosecutorial discretion has been abused, a defendant bears the burden of proving that other persons similarly situated were not prosecuted and that the decision to prosecute him was based on an impermissible factor. Id. Mr. Pretlow claims he can meet this standard. He points out that the death penalty statute permits the government to seek the death penalty against "any person engaging in or working in furtherance of a continuing criminal enterprise ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual." Although at least two of his alleged co-conspirators, Corey Grant and Irvin Bethea, have been indicted for participating in the two capital murders with which he is charged as well as for taking part in the underlying drug conspiracy, he notes that the government has not sought the death penalty against either one. Accordingly, he argues the government was impermissi-

bly selective in seeking the death penalty against him and should be barred from further pursuing that penalty.

I disagree. Neither Corey Grant nor Irvin Bethea are similarly situated to Mr. Pretlow. For instance, Corey Grant was under the age of eighteen at the time of the two murders. As even Mr. Pretlow concedes, the statute prohibits "a sentence of death [from being] carried out upon a person who is under 18 years of age at the time the crime was committed." 21 U.S.C. § 848(l). Moreover, unlike either alleged co-conspirator, Mr. Pretlow is charged in the indictment as an organizer and manager of the continuing criminal enterprise and the leader of the RICO enterprise. Accordingly, Mr. Pretlow cannot meet the first criteria for sustaining a selective prosecution claim.

Even if he could prove these alleged co-conspirators were situated similarly to himself, Mr. Pretlow has submitted no evidence in support of the second criteria for a selective prosecution claim—namely, that the government's decision to seek the death penalty solely against him was based on some impermissible factor. Indeed, the facts would appear to poin.. to the opposite conclusion. Both Mr. Pretlow and his alleged co-conspirators are black and all three have exercised their right to trial. Accordingly, I deny Mr. Pretlow's motion.

## IX. Vindictive Prosecution

Mr. Pretlow requests an evidentiary hearing in order to demonstrate to this court that the government's decision to seek the death penalty against him was based on vindictive motives. The government opposes this request.

The Supreme Court has long recognized that the due process clause prohibits a prosecutor from retaliating against a defendant for invoking his legally protected rights, including his right to trial by jury. See, e.g., *Blackledge v. Perry*, 417 U.S. 21, 27–28, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d

628 (1975). At the same time, however, the Court also has recognized that a prosecutor has broad discretion prior to trial to alter—indeed, to increase—the charges pending against a defendant to the limits of his culpability under the law. See, e.g., *United States v. Goodwin*, 457 U.S. 368, 381–82, 102 S.Ct. 2485, 2493–94, 73 L.Ed.2d 74 (1982); *Bordenkircher*, 434 U.S. at 362–65, 98 S.Ct. at 667–69. In an effort to accommodate these competing, if not conflicting, interests, the Court has required a defendant to prove that a prosecutorial decision to "up the ante" prior to trial was due to actual vindictiveness.[10] See generally *Godwin*, 457 U.S. 368, 102 S.Ct. 2485 (a presumption of vindictiveness is not applicable to prosecutorial decisions prior to trial); *Bordenkircher*, 434 U.S. 357, 98 S.Ct. 663 (prosecutor was not vindictive when he threatened to increase defendant's charges if his plea offer was rejected).

Parties here have submitted sealed affidavits regarding their pre-trial negotiations and the government's decision to seek the death penalty against Mr. Pretlow. Although I will not elaborate on the details these affidavits reveal, parties should rest assured that this court has reviewed them carefully. Based on this review, I find that Mr. Pretlow has failed to establish an appearance of vindictiveness which would warrant further inquiry. Accordingly, I deny his motion for an evidentiary hearing.

## X. The Constitutionality of Capital Punishment

As his final motion, Mr. Pretlow challenges the constitutionality of capital punishment in all cases. He argues that its application is inherently racist, vests an impermissible amount of discretion with prosecuting authorities, and results in the execution of innocent people. In addition, he stresses that the American public will become convinced at some future date that the death penalty is an immoral use of government power.

---

10. By contrast, the Court has invoked a presumption of vindictiveness where a prosecutor or a court has seemingly "up the ante" after a defendant has successfully appealed his convic-

tion or otherwise invoke a right to a new trial. See, e.g., *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Blackledge*, 417 U.S. at 27, 94 S.Ct. at 2102.

The Supreme Court has addressed each of these arguments and nevertheless decided that capital punishment comports with the requirements of the Constitution. See generally *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Accordingly, Mr. Pretlow's motion is denied.

### Conclusion

For all the foregoing reasons, Mr. Pretlow's motions challenging the constitutionality of various aspects of 21 U.S.C. § 848 are denied.