UNITED STATES of America

v.

Tyrone WALKER, Walter Diaz, Anthony Walker aka Tony Walker.

No. 3–94–CR–328.

United States District Court, N.D. New York.

Sept. 26, 1995.

U.S. Attorney (Miroslav Lovric, Bernard J. Malone, Jr., Asst. U.S. Attys., of counsel), Binghamton, NY, for Government.

Hinman, Howard & Kattel (Albert Millus, of counsel), Binghamton, NY, Ruhnke & Barret (David A. Ruhnke, of counsel), West Orange, NJ, for Defendant Tyrone Walker.

Peter Orville, P.C., Vestal, NY, Carl J. Herman, Livingston, NJ, for Defendant Walter Diaz.

Richard Allen, Binghamton, NY, for Defendant Anthony Walker.

## MEMORANDUM DECISION & ORDER

McAVOY, Chief Judge.

On September 12, 1995, the Court heard oral argument on and addressed and decided from the bench the numerous discovery requests of all parties. Herein the Court addresses the defendants'[1] remaining motions, "death penalty" and otherwise, seeking variously: a decision from this Court holding 21 U.S.C. § 848 *et seq.* and § 848(e) in particular unconstitutional; dismissal of various indictment counts and portions of the government's Notice of Intent to Seek the Death Penalty; and dismissal of the death penalty request against Tyrone Walker because the Department of Justice has engaged in systematic racial discrimination, or alternatively, discovery and a hearing on that issue. Also before the Court are the parties' opposing motions concerning disclosure of the government's witness list.

---

1. All the defendants have sought leave to join in each other's motions where applicable to them. The government has taken no position on the defendants' requests in this regard, which are hereby GRANTED.

## I. BACKGROUND:

All three of the above-captioned defendants stand accused in each count of a nine-count superseding indictment filed on September 19, 1994.[2] On May 31, 1995, the government filed Notices of Intent to Seek the Death Penalty under 21 U.S.C. § 848(e)(1)(A)[3] against defendants Tyrone Walker and Walter Diaz, if they are convicted of Counts Two or Three of the indictment.

### A. The Government's Allegations:

The government alleges that between approximately January of 1989 and September of 1993, defendants Tyrone Walker, Walter Diaz and Anthony Walker conspired with each other and over a dozen others to possess cocaine, crack, and heroin, with intent to distribute in various locations within the Northern District of New York. It is alleged that this conspiracy was maintained throughout that entire period and that between November of 1992 and March of 1993 the three defendants' roles in the conspiracy had evolved to a point where they were operating a Continuing Criminal Enterprise ("CCE"). On February 18, 1993, the three defendants allegedly caused the murder of Michael Monsour while attempting to rob Monsour of cocaine and narcotics proceeds.

## II. DISCUSSION

The Court will address defendants' motions under the Commerce Clause first, followed by *seriatim* disposition of the defendants' death-penalty motions and all parties' motions as to the witness list.

2. The indictment charges each defendant under each count as follows:

Count One: engaging in a Continuing Criminal Enterprise, ("CCE") under 21 U.S.C. § 848(a) & (c);
Count Two: CCE–Murder under 21 U.S.C. § 848(e)(1)(A);
Count Three: Narcotics Conspiracy–Murder, under 21 U.S.C. § 841(b)(1)(A), § 848(e)(1)(A) and 18 U.S.C. Section 2;
Count Four: Narcotics Conspiracy under 21 U.S.C. § 841(a)(1);
Count Five: Narcotics Possession with Intent to Distribute under 21 U.S.C. § 841(a)(1) and 18 U.S.C. Section 2;
Counts Six & Seven: Use of a Firearm in Relation to a Crime of Violence and Drug

### A. The Commerce Clause:

All the defendants seek an order dismissing Counts One through Seven of the superseding indictment on the basis that the relevant provisions of Title 18 and Title 21 are beyond Congress' power under the Commerce Clause, or, in the alternative, an order dismissing all the superseding indictment Counts because the government cannot show a nexus between these charges and interstate commerce.

Under Article I, § 8 of the United States Constitution, the Commerce Clause, Congress has the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Constitution, Art. I, § 8, cl. 3. The Supreme Court has long held that the commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824).

Commerce Clause jurisprudence originally developed through a line of cases which sought to limit state legislation that was perceived as discriminatory against interstate commerce. *See generally Wickard v. Filburn,* 317 U.S. 111, 121, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942) (tracing the line of cases that delineated, as beyond Congress' reach under the Commerce Clause, categories of state legislation). In 1935, the Supreme Court set forth a new test for Commerce Clause analysis: whether the activities had a "direct" or "indirect" effect on interstate

Trafficking Crime, 18 U.S.C. § 924(c)(1) and Section 2;
Counts Eight & Nine: Possession by a felon, in and affecting commerce, of a firearm under 18 U.S.C. § 922(g) and Section 2.

3. This statute states in pertinent part that:

Any person engaging in or working in furtherance of a Continuing Criminal Enterprise, or any person engaging in an offense punishable under § 841(b)(1)(A) ... who intentionally kills or counsels, commands, induces, procures or causes the intentional killing of an individual and such killing results shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death. 21 U.S.C. § 848(e)(1)(A).

commerce. *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 548, 55 S.Ct. 837, 851, 79 L.Ed. 1570 (1935). Just two years later the Court introduced a new "close and substantial relation to interstate commerce" test. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937).

*Jones & Laughlin Steel* and its progeny significantly expanded the scope of the Commerce Clause to any activity that had a substantial effect on interstate commerce. *See, e.g., Wickard, supra,* (expanding congressional power under the Commerce Clause to completely home-grown and home-consumed wheat). The only check on the scope of the Commerce Clause appeared to be whether there was a rational basis for the federal legislation. *See, e.g., Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 252–53, 85 S.Ct. 348, 355, 13 L.Ed.2d 258 (1964). Recently, however, the Supreme Court has sought to check the long-standing trend of expanding the authority of Congress under the Commerce Clause, and placed a limit on its reach. *See United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

**1. *United States v. Lopez* and the Commerce Clause:**

In *Lopez*, the Supreme Court affirmed a lower court's decision to overturn a defendant's conviction for possession of a firearm in a school zone in violation of the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(2)(A). *Id.*, —— U.S. at ——, 115 S.Ct. at 1633. The statute made it a crime for "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). The *Lopez* Court held that the statute exceeded Congress' Commerce Clause authority, because possession of a gun in a school zone was not economic activity that substantially affected interstate commerce. *Id.*

The *Lopez* Court traced the history of Commerce Clause jurisprudence in detail and determined that there were only three categories of activities that Congress had the power to regulate under the authority of the Commerce Clause.

First, Congress may regulate the use of the channels of interstate commerce ... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities ... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to [substantially affects] interstate commerce.

—— U.S. at ——, 115 S.Ct. at 1629 (citations omitted). In addition, the *Lopez* Court reiterated that in the absence of a jurisdictional element in the subject statute, there must be a showing of "the requisite nexus with interstate commerce." *Id.*, at ——, 115 S.Ct. at 1631 (*citing United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)). Thus, under *Lopez*, the activity, the subject of the statute, must first be shown to fall within one or more of the categories in which Congress may exercise its Commerce Clause power, and then the activity must be shown to have a substantial effect on, or nexus with, interstate commerce.

It should be noted at the outset, however, that contrary to defendants' counsel's earnest and thoughtful arguments, *Lopez* does not signal a "reversal of Supreme Court tolerance for Congressional activity under the Commerce Power." Nor, in this Court's view, does it "open to reanalysis" (Tyrone Walker's Omnibus Brief, Pt. I), all pre-*Lopez* Commerce Clause cases. The test applied in *Lopez* is "*consistent* with the great weight of [prior Supreme Court] case law." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (emphasis added). The *Lopez* Court simply determined that under the existing standards of Commerce Clause jurisprudence, the statute at issue did not pass constitutional muster. This Court finds that the statutory provisions at issue in this case do.

2. **21 U.S.C. §§ 841, 846, & 848, and 18 U.S.C. § 924, and the Commerce Clause** [4]

a. **The Activities Regulated by the Statutory Provisions at Issue are Within the Category Of Activities that Congress May Regulate Under the Commerce Clause:**

The defendants contend that the counts pending against them [5] should be dismissed because they were enacted by a Congress that was acting beyond the scope of its Commerce Power. The Court must first determine whether the statutes concern activities that may properly be placed within any of the categories set forth in *Lopez*—categories within which Congress may act pursuant to its Commerce Power.

The activity that is sought to be "regulated" by the statutory provisions challenged herein fall within the second and third categories set forth in *Lopez*. The activities, as a general category, concern the sale of narcotics and related activities. Thus, although a criminal enterprise, the narcotics themselves are both commodities and "things in interstate commerce," as set forth in the second *Lopez* category. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1629. The Court makes no exception for illicit commerce. *See also United States v. Montes–Zarate*, 552 F.2d 1330, 1331 (7th Cir.1977) ("intrastate possession, distribution and sale of drugs such as heroin directly and injuriously effected the introduction of them into other States to the injury of the public health and welfare there.") (citations omitted); *cf. Heart of Atlanta Motel* 379 U.S. at 256, 85 S.Ct. at 356–57 ("the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.") (citations omitted). In addition, as established by the following discussion, the activities have a "substantial relation to interstate commerce," and thus fit within the third category in *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629.

b. **The Activities Regulated By the Subject Statutory Provisions Substantially Affect Interstate Commerce:**

Since the statutes at issue do not have a jurisdictional component, the Court must next determine whether these activities have a substantial nexus with interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

As the Supreme Court has previously held, such a nexus may be shown by reference to Congress' findings as to the "*class of activities* regulated" assuming consideration of "the 'total incidence' of the practice on commerce." *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (emphasis in original). Moreover, "[w]here the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Id.* (citing, *Maryland v. Wirtz*, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968) (emphasis in original)). Although "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," the Court notes that express findings "would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

Title 21 U.S.C. § 801 sets forth the congressional "Findings and declarations" relating to the statutory provisions challenged

---

4. The defendants do not argue that the statutes at issue are not rationally-based. Nevertheless, the Court finds that the rationale set forth in the relevant statute and the government's papers—the control of drug trafficking—sets forth a sufficient basis to withstand constitutional scrutiny. *See* 21 U.S.C. § 801; *see also United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1880–81, 64 L.Ed.2d 497 (1980) (Powell, J., concurring in part and concurring in judgment); *United States v. McDougherty*, 920 F.2d 569, 572 (9th Cir.1990).

5. In particular, those counts pursuant to 21 U.S.C. § 848(a) & (c) (CCE), 21 U.S.C. § 848(e)(1)(A) (CCE–Murder), 21 U.S.C. § 841(b)(1)(A), § 846, & § 848(e)(1)(A) (Narcotics Conspiracy–Murder), 21 U.S.C. § 846 & § 841 (Narcotics Conspiracy), 21 U.S.C. § 841(a)(1) (Narcotics Possession with Intent to Distribute), and 18 U.S.C. § 924(c)(1) (Use of a Firearm in Relation to a Crime of Violence and Drug Trafficking).

herein.[6] As to the control and enforcement of illicit drugs and drug trafficking *as a class of activity,* Congress has expressly found that "the illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). Congress has also found that a "major portion of the traffic in controlled substances flows through ... interstate commerce" and that "[i]ncidents of the traffic which are not an integral part of the interstate ... flow ... have a substantial and direct effect upon interstate commerce." 21 U.S.C. § 801(3) (reasons set forth include prior and subsequent interstate transport).

Neither the statute at issue in *Lopez,* nor its legislative history, contained any legislative findings so as to guide the courts in analyzing any effect on interstate commerce. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Moreover, the government's attempt in *Lopez* to "import" Congress' findings as to other statutory provisions was found to be inappropriate "because the 'prior federal enactments ... [did not] speak to the subject matter of [the statute] or its relationship to interstate commerce." *Id. (quoting U.S. v. Lopez,* 2 F.3d 1342, 1366 (5th Cir.1993)). Furthermore, the Supreme Court concluded after examining the government's contentions regarding substantial effect on interstate commerce, that to uphold such findings, it "would have to pile inference upon inference" to such an extent that Congress would be granted a virtual police power, in clear contravention of long-standing notions of federalism. *Id.,* —— U.S. at ——, 115 S.Ct. at 1633. In this case, however, the Court need not leap the inferential hurdles that ultimately led to the invalidation of the statue in *Lopez.*

These defendants are charged under statutes that regulate activities that clearly fall within the broad categories described in *Lopez* and prior case precedent. Moreover, Congress has set forth clear findings and declarations with respect to the illegal sale and trafficking of illicit drugs and related activities. The Court holds that there is a substantial nexus between the class of activities at issue and interstate commerce.[7] Therefore, Congress properly enacted the subject statutory provisions of Title 21 and Title 18 pursuant to its power under the Commerce Clause. Accordingly, the Court denies all of the defendants' motions to dismiss each count of the superseding indictment on Commerce Clause grounds.

## B. 21 U.S.C. § 848 *et seq.*:

Defendants Tyrone Walker and Walter Diaz join together in mounting numerous constitutional and statutory attacks on § 848 and the superseding indictment.

### 1. Appellate Review under § 848:

Tyrone Walker, joined by Walter Diaz, seeks an order declaring the § 848 death penalty unconstitutional for failing to provide meaningful appellate review. The defendants characterize § 848's appeal provisions, set out at 21 U.S.C. § 848(q),[8] as sharply

---

**6.** These findings, while not directly expressed in Title 18 U.S.C. § 924(c)(1), are as relevant to that provision as to the challenged provisions under Title 21, since both provisions concern crimes of violence and drug trafficking. Accordingly, the Court is informed by these findings as to both provisions.

**7.** A number of courts have found federal jurisdiction over the distribution of controlled substances based on a nexus between the activity and interstate commerce. *See, e.g., United States v. Montes–Zarate,* 552 F.2d 1330, 1331 (9th Cir. 1977) (finding federal jurisdiction as to statute relating to the distribution and sale of illegal drugs), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978); *United States v. Atkinson,* 513 F.2d 38, 40 (4th Cir.1975) ("Congressional findings on which the legislation rested disclosed that intrastate possession, distribution and sale of drugs such as heroin directly and injuriously effected the introduction of them into other States to the injury of the public health and welfare there."); *United States v. Esposito,* 492 F.2d 6, 10 (7th Cir.1973) (Congress had the "power to regulate the use and distribution of cocaine without requiring proof in each prosecution of some connection with interstate commerce"), *cert. denied,* 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 760 (1974); *United States v. Scales,* 464 F.2d 371, 374–76 (6th Cir.1972) (same); *United States v. Lopez,* 459 F.2d 949, 952–53 (5th Cir.1972) (same), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).

**8.** That section reads in pertinent part as follows:
(1) In any case in which the sentence of death is imposed under this section, the sentence of

curtailing appellate review, thereby rendering the statute unconstitutional.

■ The inquiry's starting point is the well established requirement that any statutory scheme in which death is an available penalty must afford meaningful appellate review: "meaningful appellate review ... ensur[es] that the death penalty is not imposed arbitrarily or irrationally ... [and] minimizes the risk of constitutional error." *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991) (citations omitted); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ The Court first observes that the statute places no limitation on the *bases* over which appellate review of a death sentence may be undertaken. Section 848(q)(2) makes clear that the entire record is amenable to review when the court of appeals scrutinizes a sentence of death. The Court also notes that the statute places no limitation on, and indeed expressly contemplates the existence, of conventional appeal of the judgment of conviction.

The defendants point to § 848(q)(3)(A) & (B)'s requirement that the court of appeals affirm the sentence unless it determines that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or that the aggravating and mitigating findings are unsupported, and argue that these provisions limit the *scope* of appellate review. While the "arbitrary factor" language is subject to varying interpretation, that ambiguity itself militates for a construction that avoids the conclusion that the statute is unconstitutional. *See Rust v. Sullivan*, 500 U.S. 173, 189, 111 S.Ct. 1759, 1770, 114 L.Ed.2d 233 (1991); *see also, Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) (every reasonable construction must be resorted to in order to save a statute from unconstitutionality).

Other district courts called upon to construe this language have applied the foregoing canon of construction and concluded that the phrase "any other arbitrary factor" is broad enough to encompass the essential elements of meaningful appellate review. *See United States v. Pretlow*, 779 F.Supp. 758, 763–64 (D.N.J.1991) (construing § 848(q)(3)(A) & (B) as permitting appellate review of harmful errors of law); *United States v. Pitera*, 795 F.Supp. 546, 566–67 (E.D.N.Y.1992) (*"Pitera I"*) (statute fairly interpreted to permit whatever review is reasonably necessary to ensure against arbitrary decision-making), *affirmed w'out opinion*, 986 F.2d 499 (2d Cir.1992).

This Court is likewise of the opinion that were an appellate court to detect any of the potential horribles paraded by the defendants (*i.e.* error of law, improper summation, improper instruction of the jury, outside influence on the jury) it would be free under the statute to conclude that the sentence was infected with an "arbitrary factor," thereby requiring remand of the case for reconsideration. *See* § 848(q)(3). It follows then, that § 848 affords meaningful appellate review and as such, defendants' motion for a declaration that the 21 U.S.C. § 848(e) death penalty provision is unconstitutional *for failing to provide meaningful appellate review* is DENIED.

## 2. Statutory Aggravating Factors:

If the defendants are convicted under Count Two or Three, § 848(i)–(o) prescribes

death shall be subject to review by the court of appeals upon appeal by the defendant.... An appeal under this section may be consolidated with an appeal of the judgment of conviction. Such review shall have priority over all other cases.

(2) *On review of the sentence, the court of appeals shall consider the record, the evidence submitted during the trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section.*

(3) The court shall affirm the sentence if it determines that—

(A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(B) the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

In all other cases the court shall remand the case for reconsideration under this section.

21 U.S.C. § 848(q).

the procedures by which the penalty phase sentencing hearing will be conducted. Under § 848(j) the government will open the hearing before the same jury that decided the defendant's guilt, (absent certain exceptions at § 848(i) not relevant to this discussion), and attempt to establish certain statutory aggravating factors, § 848(n)(1)–(12) and certain *non*-statutory aggravating factors of which it has previously given notice. § 848(h)(1)(B). Aggravating factors must be established beyond a reasonable doubt and must be found by the jury unanimously. § 848(j) & (k).

The defendants are then afforded the opportunity to rebut the government's showing and to establish mitigating factors, which must be established by a preponderance of the evidence and may be found by any individual juror or any number of jurors. § 848(j) & (k). The government is then permitted to reply in rebuttal. § 848(k).

Under the statutory structure enumerating the aggravating factors, § 848 establishes two categories of *statutory* aggravating factors: one category is listed in § 848(n)(1) and the other category is listed in § 848(n)(2)–(12). The jury must find *at least one* of the enumerated statutory aggravating factors from *each* category before the death penalty may be considered. § 848(k). After finding at least one statutory factor from each category, the jury may go on to consider *non*-statutory aggravating factors ("any other aggravating factors which the government will seek to prove as the basis of the death penalty") as to which the government has previously given notice as required under § 848(h)(1)(B). The death penalty may be **considered** only if the jury has found one aggravating factor from each category. The

death penalty may be **imposed** only if the jury goes on to find that the two required statutory factors, plus any other statutory and/or non-statutory aggravating factors it has found, sufficiently outweigh any and all mitigating factors that it may have found.[9] If no mitigating factors have been found the jury must determine whether the aggravating factors themselves are sufficient to justify a sentence of death. § 848(k).

Defendants Tyrone Walker and Walter Diaz posit numerous constitutional infirmities in the aggravating factor statutory scheme.

### a. The § 848(n)(1) Statutory Aggravating Factors:

■ Defendants argue that because the § 848(n)(1)[10] aggravating factors simply duplicate an essential element of the homicide offense defined in § 848(e)(1)(A), the statute is unconstitutional, if not in whole, at least to the extent that it permits the jury to consider a duplicated factor when it weighs its aggravating and mitigating findings.

It is well settled that a capital punishment scheme must "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). In *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court clarified that the requisite narrowing may be performed either by narrow legislative definition of capital offenses, or, by jury findings which narrow the class of candidates for capital punishment within more broadly legislatively defined capital offenses. *Id.* at 246, 108 S.Ct. at 555.

The Court first finds that 21 U.S.C. § 848(e)(1)(A) is within that class of statutes which sufficiently legislatively narrows the

---

**9.** It is apparently hotly disputed whether the jury must find that the aggravating factors outweigh the mitigating factors "beyond a reasonable doubt," or merely find that the aggravating simply outweighs the mitigating. Notwithstanding the volume of bold-face ink spilt over the question to date, the Court herein leaves the issue for future consideration.

**10.** These statutory "Mens Rea" factors are that:

 **(1)** The defendant—
 **(a)** intentionally killed the victim;

 **(b)** intentionally inflicted serious bodily injury which resulted in the death of the victim;
 **(c)** intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;
 **(d)** Intentionally engaged in conduct which—
 **(i)** the defendant knew would create a grave risk of death to a person other than one of the participants in the offense; and
 **(ii)** resulted in the death of the victim.
 21 U.S.C. § 848(n)(1)(a)–(d).

class of death-eligible defendants by restricting application of capital punishment to intentional homicides committed in connection with large scale narcotics trafficking. *Accord Pitera I*, 795 F.Supp. at 557; *Pretlow*, 779 F.Supp. at 771–73. Additionally, by requiring further narrowing through its mandate that at least one additional aggravating factor be found from the § 848(n)(2)–(12) category, this death penalty scheme sufficiently guides and narrows the sentencer's discretion. *See Gregg*, 428 U.S. at 206–07, 96 S.Ct. at 2940–41.

Defendants point out that this is a statute of the "weighing" variety. They argue that if the jury weighs as an aggravating factor that which is an essential element of the crime charged (and by definition previously established at the guilt phase) it will result in "inevitably tilt[ing] the sentencing scales toward the imposition of the death penalty." *Lowenfield,* 484 U.S. at 258, 108 S.Ct. at 562 (Marshall, J., dissenting).

The foregoing analysis establishes, however, that the jury will have performed the constitutionally requisite narrowing function at the guilt phase. *Pitera I,* 795 F.Supp. at 557. In light of that conclusion, the Court finds no other basis to compel the conclusion that independent weighing at sentencing of a factor previously established at the guilt phase would in all cases impermissibly skew the weighing process; nor have defendants raised any persuasive argument why this must be so. To the extent that the balancing might somehow be unfairly tipped by the fact that the sentencing jury has previously determined the element's existence, Judge Raggi's instructions in *Pitera,* 795 F.Supp. at 557, seem plainly adequate to allay any concerns in this regard. Such an instruction will be offered should the need for consideration of aggravating and mitigating factors come to pass, and defendants' motion for an order declaring the statute unconstitutional because of § 848(n)(1)'s duplication of an element of the crime is in all other respects DENIED.

**b. The § 848(n)(2)–(12) Factors:**

Defendants Tyrone Walker and Walter Diaz also seek an order dismissing certain of the § 848(n)(2)–(12) statutory factors that the government has given notice that it will seek to establish at sentencing.[11] Their primary arguments concern application of the rule of lenity to the statutory language defining the aggravating factors. Defendants articulate the rule that "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). While the defendants accurately describe the rule of lenity's application once properly invoked, defendants somewhat overstate the *scope* of application of this canon of construction. "The mere possibility of articulating a narrower construction, however, does not by itself make the rule of lenity applicable. Instead, that venerable rule is reserved for cases where, 'after seizing everything from which aid can be derived,' the Court is 'left with an ambiguous statute.'" *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (*quoting United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)) (citations omitted). The Court's first task, therefore, is to attempt to construe the statutory language in light of its ordinary and natural meaning. *See Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).

**11.** The § 848(n)(2)–(12) statutory aggravating factors which the government has given notice it intends to assert against these defendants are: **(5)** In the commission of the offense or in escaping apprehension for a violation of subsection (e) of this section, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

**(7)** The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. **(8)** The defendant committed the offense after substantial planning and premeditation. § 848(n)(5), (7), (8).

**i. § 848(n)(7):**

■ In its Notices of Intent to Seek the Death Penalty against both Walter Diaz and Tyrone Walker, the Government has alleged that in committing the offenses described in Counts II and III of the superseding indictment (i.e. the murder of Michael Monsour), both defendants did so "as consideration for the receipt and in expectation of the receipt of something of pecuniary value, that is, drugs and money." The statute contemplates as an aggravating factor circumstances where "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." § 848(n)(7)

Defendant's argue that § 848(n)(7) is intended to apply only to either "murder for hire … or, for example, to gain an inheritance or life insurance proceeds." (Tyrone Walker Brief in Support of Death Penalty Motions at 62). They argue that the government's evidence will at best show that the Monsour homicide was committed in the course of a robbery, and that the intent with which the murder is carried out has to be pecuniary gain over and above robbery. The Court finds that defendants' interpretation is an unreasonably restrictive reading which does not comport with the structure and plain language of the statute.

The Court first notes that § 848(n)(7) has two prongs: that the offense was committed "as consideration for the receipt" *or* "in expectation of the receipt" of something of pecuniary value. Defendants' view seems correct that the first prong's use of the "as consideration for" language of contract contemplates murder-for-hire.[12] For this Court to transport that restriction to the second, "in expectation of the receipt," prong, however, would render the second clause mere surplusage.[13] Defendants also point to the statutory structure and argue that since this factor follows § 848(n)(6) ("The defendant *procured* the commission of the offense by payment, or promise of payment, of anything of pecuniary value") (emphasis added), Congress intended § 848(n)(7) to identify the flip-side of procuring a murder-for-hire. It is enough to say that a finding that the first clause does indeed comprehend the other half of murder through solicitation does not preclude Congressional use of the second clause as a means of narrowing application of the death penalty by establishing as an aggravating factor all intentional murders committed with the expectation of *any* pecuniary benefit.

Nor can the Court reasonably restrict the term "expectation" to its Dickensian aspect of inheritance. Webster's defines "expectation" as "**1.** the act of expecting or state of being expected. **2.** Eager anticipation."[14] WEBSTER'S II NEW RIVERSIDE DICTIONARY 455 (1994). "Expect" is defined therein as "**1.** to look forward to the probable occurrence or appearance of; **2.** to consider likely or certain." *Id.* In short, nothing in the plain and ordinary meaning of "expectation" serves to limit an understanding of Congress' use of the term to murders in expectation of the receipt[15] of an inheritance. Defendants themselves recognize this by admitting to the language's sweep, murder in expectation of insurance proceeds. They offer no princi-

---

**12.** *Compare* 18 U.S.C. § 1958 (the federal "murder-for-hire statute") which speaks of "intent that a murder be committed … as *consideration* for the receipt of … anything of pecuniary value." 18 U.S.C. § 1958(a) (emphasis added).

**13.** *Compare* 18 U.S.C. § 1958, which expressly transports the language of contract to *both* its prongs as follows: "with intent that a murder be committed … as *consideration* for the receipt of, or as *consideration* for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a) (emphasis added). There is no dispute that § 1958 speaks only to murder-for-hire: had Congress intended defendants' narrow construc-tion it could have indicated so by similar transportation here.

**14.** "Future prospects <great *expectations*>," *id.,* runs a distant third.

**15.** Nor does the term "receipt" serve to limit interpretation of the statute to pecuniary benefit which accrues to a defendant in a transactional sense, which seems to be the gist of defendants' argument. "Receipt" in its plain and ordinary meaning is defined as "**1a.** An act of receiving something; **b.** The fact of being received." WEBSTER'S II NEW RIVERSIDE DICTIONARY 981 (1994) "Receive" is defined as "**1.** To acquire or *take* (something given, offered or transmitted): GET." *Id.*

pled reason why the second prong stops there and reaches no further, however, and the Court sees no textual basis upon which to conclude that the second clause admits these fact patterns but excludes all others.

In short, nothing in the plain language or the structure of the statute militates for defendants' restriction of "in expectation of the receipt, of anything of pecuniary value." Indeed use of the phrase "*anything* of pecuniary value" further contravenes such a narrowing construction. *See Smith* —— U.S. at ——, 113 S.Ct. at 2054 ("The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it."). The Court will not, then, find that § 848(n)(7) can only apply to murder-for-hire or murder in anticipation of an inheritance or insurance proceeds. Defendants' motion to dismiss this factor on that basis is DENIED. Whether the factor can be properly submitted to a jury as against these defendants must of course await further factual development at trial.

### ii. § 848(n)(8):

▇▇▇ The government also alleges that in committing the offenses described in Count II and III of the superseding indictment, both defendants did so "after substantial planning and premeditation." The statute contemplates as an aggravating factor circumstances where "the defendant committed the offense after substantial planning and premeditation." § 848(n)(8).

The defendants first argue that the use of the word "substantial" is impermissibly vague in that it defies a definition clear enough to guide a jury in distinguishing between those who "simply" plan and "premeditate" and those who do so "substantially." The Court joins with the other Courts which have considered these arguments and finds that substantial (considered in opposition to minimal) is a familiar concept in the context of criminal law and one readily understood by a properly instructed jury. *See United States v. Cooper*, 754 F.Supp. 617, 623 (N.D.Ill.1990); *See also Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255 (1990) (discussing, in

dicta, as a mitigating factor, whether defendant was "substantially" impaired from appreciating his conduct); *United States v. Rovetuso*, 768 F.2d 809, 821–23 (7th Cir.1985) (discussing the statutory meaning of "substantial" step toward commission of a crime), *cert. denied*, 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986). As such, defendants' vagueness arguments as to this factor must be rejected.

Defendants also argue that the facts of this case will not support a finding that the defendants engaged in substantial planning. A determination as to whether the substantial planning and premeditation factor can be properly applied to these defendants must await factual development at trial.

### iii. § 848(n)(5):

The government also alleges that in committing the offenses described in Counts II and III of the superseding indictment both defendants "knowingly created a grave risk of death to other persons in addition to victim Michael Monsour," those "other persons" being third parties who were present during the course of conduct which concluded with the Monsour murder. The statute contemplates as an aggravating factor circumstances where "in the commission of the offense or in escaping apprehension for a violation of subsection (e) of this section, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense."

The defendants point to varying interpretations by various state courts of *similarly* constructed statutory aggravating factors regarding risk to third parties. In particular, defendants point to the Annotation, "Sufficiency of Evidence for Purposes of Death Penalty to Establish Statutory Aggravating Circumstance that in Committing Murder, Defendant Created Risk of Death or Injury to More Than One Person, to Many Persons, and the Like—Post *Gregg* cases," 64 A.L.R.4th 837. The annotation indeed offers a smorgasbord of judicial construction of legislative attempts to capture, as an aggravating factor, various scenarios where capital defendants have placed third parties in harm's way. The Court notes its disagree-

ment, however, with defendants' proposition that in light of these varying interpretations the rule of lenity requires the Court to adopt the strictest. As stated above, the Court's primary task is to interpret the language of *this* statute: "the rule of lenity is a tie-breaker when there is an otherwise-unresolved ambiguity." *United States v. White,* 888 F.2d 490, 497 (7th Cir.1989); *see also Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 111–12, 103 S.Ct. 986, 991, 74 L.Ed.2d 845 (1983) (construction of a federal statute is "necessarily ... a question of federal, not state, law"). The annotation and the cases collected therein reflect a wide variety of statutory language,[16] and, presumably, legislative history. No single one of these necessarily compels the conclusion that § 848(n)(5) is irredeemably ambiguous. *Compare United States v. Pitera,* 795 F.Supp. 571, 575 (E.D.N.Y.1992) ("*Pitera II* ") (little guidance found in varying interpretations turning on "discrete capital sentencing schemes."). Having said that, proper interpretation of the statutory language presents several nice questions which of course must be "strictly construed against the government or parties seeking to enforce statutory penalties and in favor of the persons on whom penalties are sought to be imposed." SUTHERLAND STAT CONSTRUCTION § 59.03, 5th Ed. (1992 & 1994 Supp.).

The government alleges that in the course of the Monsour incident, bystanders were both shot at and threatened at gunpoint, circumstances which if proven might satisfy even the narrowest construction of "knowingly created a grave risk of death to one or more persons." In light of those allegations, further decision as to the ambit of this aggravating factor can await factual development at trial. At that time, assuming resolution of the question becomes necessary, both the parties and the Court will have the benefit of argument on the issues in the context of a fully developed factual record.

### 3. Non–Statutory Aggravating Factors:

As indicated above, only after finding at least one statutory factor from each of the aforementioned categories can the jury go on to consider *non*-statutory aggravating factors of which the government has previously given notice, defined (or undefined) as "any other aggravating factors which the government will seek to prove as the basis of the death penalty." § 848(h)(1)(B).

Defendants' Tyrone Walker and Walter Diaz seek an order dismissing the *non*-statutory factors the government has given notice of, or, in the alternative, an order empaneling successive guilt and penalty phase jurors, so as to allow defense *voir dire* on the non-statutory aggravating factors.

### a. The Non–Delegation Doctrine:

Defendants first argue that Congress' concession to the government the power to "define" a § 848 violation by its statutorily-derived ability to assert "any other aggravating factors," represents an impermissible delegation of legislative power in violation of the non-delegation doctrine. As derived from the United States Constitution's mandate that "all legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. Art. I, § 1, that doctrine prohibits Congress from delegating its entire legislative power to another branch of government. *See Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989).

 Defendants' argument, however, stems from their fundamental misrepresentation of § 848's capital punishment scheme: their assertion that the non-statutory aggravating factors perform the constitutionally required narrowing· of the class of death-eligible defendants. In fact, this Court has

---

**16.** By way of example:

Many of the statutes include an aggravating circumstance focusing on a threat from the act of murder to particular persons other than a homicide victim, or to the general public requiring variously that the defendant had created a great risk of death to "more than one person," to "another person in addition to the victim," to "many persons," and the like. Some of the statutes provide that the risk be created "in a public place" and by means of a "weapon or device normally hazardous to the lives of more than one person", and others include a risk of "bodily injury" as well as a risk of death.

64 A.L.R.4th, § 2[a] at 846.

already found that the requisite narrowing is achieved through legislative restriction of those murderers properly subject to capital punishment, *see Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555, as well as the requirement that the jury find at least one of the § 848(n)(2)–(12) factors before it may consider the death penalty. As held above, well before reference to the non-statutory aggravating factors, the statute narrows and guides capital sentencing discretion in an objective, evenhanded and substantively rational way. *See Zant,* 462 U.S. at 862, 103 S.Ct. at 2733. Viewed in this context, then, the non-statutory aggravating factors are not of one with the constitutionally required narrowing process, but rather, are a mechanism by which the prosecution presents to the sentencer "as much information … as possible when it makes the sentencing decision." *Gregg,* 428 U.S. at 203–04, 96 S.Ct. at 2939; *Walton v. Arizona,* 497 U.S. 639, 647–48, 110 S.Ct. 3047, 3054, 111 L.Ed.2d 511 (1990) ("Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts.") (citations omitted). The Court notes also that even were the jury to find all the alleged non-statutory aggravating factors proven beyond a reasonable doubt, they remain free to decline to impose capital punishment.

In short then, through their allegation and proof of non-statutory aggravating factors "the prosecution engages in advocacy, not legislation." *See Pitera I,* 795 F.Supp. at 560 (no delegation of legislative power by § 848(h)(1)(B) & (j)); *compare Pretlow,* 779 F.Supp. at 765–68 (§ 848(h)(1)(B) & (j) constitute a *permissive* delegation of legislative authority). As such, the government's statutory power to plead and prove "any other aggravating factors which the government will seek to prove as the basis of the death penalty," § 848(h)(1)(B), does not offend the non-delegation principle and defendants' motions for dismissal on this basis are DENIED.

**b. Proportionality Review:**

Defendants argue that proportionality review [17] is necessary in *all* cases in which a death penalty scheme permits a jury to consider non-statutory aggravating factors. Their argument is derived in whole from the *Zant* Court's acknowledgment and approval of Georgia's statutory scheme, which mandated appellate review "to avoid arbitrariness and to assure proportionality." *Zant,* 462 U.S. at 890, 103 S.Ct. at 2749. The Court finds that *Zant* does not compel a rule of mandatory proportionality, but rather turned in relevant part on the Court's conclusion that overall, Georgia's statutory scheme assured that "a death sentence [would] be set aside if the invalidation of an aggravating circumstance [made] the penalty arbitrary or capricious." *Id.* This Court has already found that § 848 ensures to itself the essential elements of meaningful appellate review and fairly read, *Zant* requires no more. *See Pulley,* 465 U.S. at 50, 104 S.Ct. at 879 ("While emphasizing the importance of mandatory appellate review under the Georgia Statute we did not hold that without comparative proportionality review the statute would be unconstitutional."); *compare Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (noting that under Mississippi's weighing statute "we require close appellate scrutiny of the import and effect of invalid aggravating factors," but not mentioning proportionality review). Post-*Zant* Supreme Court pronouncements further undercut defendants' arguments. *See Pulley,* 465 U.S. at 50–51, 104 S.Ct. at 879 (addressing California's non-weighing statute and finding that "there is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."). The Court also notes that nothing in § 848 forecloses application of proportionality review at the appellate level in the appropriate case. *See Pitera I,* 795 F.Supp. at 560.

17. Proportionality review is defined as appellate inquiry into "whether the [death] penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley v. Harris,* 465 U.S. 37, 43, 104 S.Ct. 871, 876, 79 L.Ed.2d 29 (1984).

In light of the foregoing the Court finds that proportionality review is neither constitutionally required for, nor statutorily foreclosed from, appellate review of death sentences under § 848. *Accord, Pitera I,* 795 F.Supp. at 559–60; *Pretlow,* 779 F.Supp. at 768–69; *Cooper,* 754 F.Supp. at 626. As such, defendants' motions to dismiss the government's non-statutory aggravating factors on this basis is DENIED.

### c. Unadjudicated Criminal Conduct and the Relaxed Evidentiary Standard:

■ The government's Notice of Intent to Seek the Death Penalty alleges as non-statutory aggravating factors, numerous instances of unadjudicated criminal conduct allegedly engaged in by Tyrone Walker and Walter Diaz.[18] Assuming that a penalty phase is necessary, those defendants seek an order from this Court dismissing all aggravating factors which allege unadjudicated criminal conduct, and precluding the introduction of evidence of such at any penalty hearing. The Court herein also addresses defendants' motions seeking an order declaring the § 848 death penalty unconstitutional because the relaxed evidentiary standard [19] at the penalty phase lowers the government's burden and renders any death verdict unreliable.

As the defendants point out, the issue of unadjudicated criminal conduct lurks squarely at the intersection (read collision) of two powerful but competing principles of death penalty jurisprudence. One principle teaches that " 'the penalty of death is qualitatively different' from any other sentence.... [T]his qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (citations omitted).

The competing principle teaches that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Contemporaneous with its decision in *Woodson,* the Supreme Court reaffirmed the principle that "what is essential is that a jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). More recent cases establish that the principle of individualized determination fully informed by all relevant evidence applies to both mitigation and aggravation. *See Barefoot v. Estelle,* 463 U.S. 880, 896–99, 103 S.Ct. 3383, 3396–97, 77 L.Ed.2d 1090 (1983).

The latter principle militates strongly for introduction of evidence of unadjudicated criminal conduct. The defendants rely primarily [20] on the former principle and argue

---

**18.** As a free-standing non-statutory aggravating factor the government has alleged against both defendants a heretofore unadjudicated homicide, allegedly committed on February 23, 1993, by both defendants. Both defendants are currently awaiting trial for this crime on a Manhattan indictment charging them with murder.

Under the rubric of "future dangerousness," the government alleges as non-statutory aggravating factors, *inter alia,* the following unadjudicated criminal conduct against Tyrone Walker: an unadjudicated 1987 homicide; robbery at gunpoint of numerous drug dealers between January of 1988 and November of 1990 and November of 1992 and January of 1993; a narcotics-related assault on May 11, 1992; and while incarcerated, participation in the stabbing of a fellow inmate on September 6, 1992, solicitation of a hitman to kill a witness, and possession of a weapon (a razor).

Under future dangerousness, the government alleges similar criminal conduct against Walter Diaz including *inter alia,* that on January 31, 1995, while incarcerated, he set fire to his cell.

**19.** Section 848(j) provides in relevant part:

Any other information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. 21 U.S.C. § 848(j).

**20.** Defendants also point to the eight states which *per se* exclude consideration of such evidence. It must be noted that four of these ex-

that in the absence of a judgment of conviction, any such evidence is inherently unreliable and more prejudicial than probative. As a starting point, the Court will not hold that in all instances, evidence of unadjudicated criminal conduct is necessarily so unreliable as to be more unfairly prejudicial than probative. Such a "rule of unreliability" is far too broad—indeed, were the Court to hold such and also adopt defendants' arguments that the § 848(n)(2)–(12) factors define the world of admissible ADJUDICATED criminal conduct, § 848(h)(1)(B)'s concept of "any other aggravating factors" begins to look like an empty set: in no sense consistent with the desire "for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg*, 428 U.S. at 204, 96 S.Ct. at 2939 (1976).

The non-statutory factors that the government will offer at sentencing will always seek to "increase the likelihood that [defendants will] be sentenced to death," *Barefoot*, 463 U.S. at 905, 103 S.Ct. at 3401, and will generally, at some level, at least *implicate* that broad category defendants call unadjudicated criminal conduct,[21] e.g. *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (reviewing evidence of adjudicated and unadjudicated criminal conduct of widely varying severity, offered at penalty phase in support of a finding of future dangerousness, while affirming verdict of death). Assuming that the reliability of such evidence is ensured, however, which in turn minimizes the risk of *unfair* prejudice, the fact that the evidence implicates unadjudicated criminal conduct does not alone render such evidence any less admissible than any other relevant evidence:

> [T]he Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating circumstances or statutory mitigating factors, as long as that information is relevant to the character of the

defendant or the circumstances of the crime ... What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

> *Barclay v. Florida*, 463 U.S. 939, 967 [103 S.Ct. 3418, 3433–34, 77 L.Ed.2d 1134] (1983) (Stevens, J., joined by Powell, J., concurring in the judgment) (citations omitted).

While § 848(j) expressly disengages the Federal Rules of Evidence for the sentencing hearing, it mandates that the Court exclude any information "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." § 848(j). Coupled with the constitutionally requisite heightened reliability required at capital sentencing, *see Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), this injunction sufficiently permits and requires the Court to ensure the reliability of the information offered at sentencing. *See Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *accord, Pitera I*, 795 F.Supp. at 564–66; *Pretlow*, 779 F.Supp. at 769–71. Under the mandate that the Court exclude evidence that it finds substantially more unfairly prejudicial than probative, and given the inherently prejudicial nature of such unadjudicated criminal conduct, which *a fortiori* rises with the severity of the conduct alleged, it would seem reasonable to require a high level of probity (which necessarily comprehends reliability) to guard against the danger of *unfair* prejudice.

In the event that a sentencing hearing is necessary, the Court will undertake to employ procedures which will ensure the reliability of the evidence supporting the government's allegations of unadjudicated criminal conduct. Both sides will be required to brief

---

clude such evidence on statutory or other parochial grounds and that sixteen states allow the admission of such evidence, of which ten employ heightened procedural protections. *See* Smith, Steven Paul, *Unreliable and Prejudicial: The Use of Extraneous and Unadjudicated Offenses in the Penalty Phases of Capital Trials*, 93 COLUM.L.REV. 1249, 1267–83 (1993).

21. Absent trivial allegations, *i.e.* a defendant's use of a vulgar epithet to refer to his alleged victim, as the government alleges here as a non-statutory aggravating factor.

the issues so as to assist the Court in arriving at a process by which the Court can do so. *See, e.g.,* Smith, *Unreliable and Prejudicial,* 93 Colum.L.Rev. at 1271–77 (surveying methods employed by various states).

Based on the foregoing, however, and on thorough review of the relevant case law, the Court will not hold that all unadjudicated criminal conduct is inadmissible at the penalty phase. Such a rule seems plainly inconsistent with, and unduly restrictive of, the overarching principle that a properly guided jury must be afforded any relevant information "about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg,* 428 U.S. at 192, 96 S.Ct. at 2934. While such a rule might be the wiser choice, such is not the choice Congress made, *see* § 848(h)(1)(B), or a choice that the Constitution compels. *See Williams v. Lynaugh,* 814 F.2d 205 (5th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987); *Milton v. Procunier,* 744 F.2d 1091, 1097–98 (5th Cir.1984); *United States v. Bradley,* 880 F.Supp. 271, 286–87 (M.D.Pa.1994); *see also Johnson,* 509 U.S. at ——, 113 S.Ct. at 2658 (evidence of unadjudicated criminal conduct offered at penalty phase); *cf. Pitera I,* 795 F.Supp. at 564 (defendant's past murders admissible and "relevant to his character and his propensity to commit violent crimes"). Defendants' motions for dismissal of the non-statutory aggravating factors on this basis is DENIED.

Based on the foregoing conclusion that § 848(j)'s standards are more than sufficient to allow the Court to ensure the reliability, the probity and the fundamental fairness of the information offered at sentencing, the Court also DENIES defendants' motions seeking an order declaring the § 848 death penalty unconstitutional based on the evidentiary standard to be employed at the penalty phase. *See Williams,* 337 U.S. at 241, 69 S.Ct. at 1079; *accord, Pitera I,* 795 F.Supp. at 564–66; *Pretlow,* 779 F.Supp. at 769–71.

### d. Particular Non–Statutory Aggravating Factors:

Tyrone Walker (joined by Walter Diaz where relevant to him) objects to various non-statutory aggravating factors in particular.

### i. Prior Criminal Conduct:

 Tyrone Walker objects to the introduction, as non-statutory aggravating factors, of the government's allegations of two unadjudicated homicides (Govt.Notice of Intent, ¶¶ C.1, C.4.a), an attempted robbery for which he has been convicted (Govt.Notice of Intent, ¶ C.2), a prior narcotics conviction (Govt.Notice of Intent, ¶ C.3), and distribution of a controlled substance to a person under twenty-one years of age (Govt.Notice of Intent, ¶ C.6). He argues that Congress made different choices in defining relevant prior offenses in the § 848(n)(2)–(12) statutory aggravating factors.[22] He also argues that Congress failed to include here as statutory aggravating factors, prior criminal conduct which it included elsewhere as statutory aggravating factors. *See* 18 U.S.C. § 3592(c)(2) ("previous conviction of prior violent felony involving a firearm"). The argument goes that by alleging as non-statutory factors conduct which the Congress could have chosen to include as statutory aggravating factors, the United States Attorney impermissibly contravenes Congress' will.

In light of the Court's previous conclusions as to the narrowing function served by the statutory aggravating factors, and the wholly separate function of the non-statutory aggravating factors in ensuring that the "jury have before it all possible relevant information about the individual defendant whose fate it must determine," *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958, there is no merit to defendant's arguments that by choosing one factor for one purpose Congress excluded the use of other factors for another purpose. Nor do these arguments find any support in the case law. Defendant's motion to dismiss these

---

**22.** By way of example: 21 U.S.C. § 848(n)(2) reads "the defendant has been *convicted* of another federal offense or a State Offense resulting in the death of a person" (emphasis added); §§ 848(n)(4) & (10) call for either two or more defined offenses for distribution of a controlled substance, or, previous federal narcotics convictions or a previous CCE conviction, under certain defined circumstances.

non-statutory aggravating factors on this basis is DENIED. *Accord, Bradley,* 880 F.Supp. at 286 (statutory aggravating factors cannot be reasonably interpreted to provide a ceiling as to the information which may be submitted to the jury).

### ii. Future Dangerousness:

██ Defendants' motions to dismiss the non-statutory aggravating factor of "future dangerousness" on vagueness grounds is DENIED. *See Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958; *Simmons v. South Carolina,* —— U.S. ——, ——, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994) ("This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial"); *accord, Bradley,* 880 F.Supp. at 287.

### iii. Tyrone Walker's "Callousness" & Walter Diaz's "Defiance":

██ In paragraph C.4.g of its Notice of Intent, the government alleges that "Tyrone Walker has displayed a total lack of remorse for the killing of Michael Monsour, in that, while incarcerated in the Federal Correctional Institution in Otisville, New York, Tyrone Walker stated, in substance, that he and Walter killed the "motherf* * *er." In light of the obvious prejudice entailed by singling out and presenting this epithet to the jury as a non-statutory aggravating factor, and in light of the numerous competing inferences which can be drawn from the use of such vulgarisms, and overall, in light of the sheer triviality of this allegation as compared to the portentous purposes for which it is alleged, the Court can conceive of no purpose for which presentation of this information as a discrete non-statutory aggravating factor could be viewed as more probative than unfairly prejudicial.

██ Much the same can be said for the government's allegations, as a non-statutory aggravating factor, that at his sentencing in 1994 for an attempted robbery Walter Diaz replied to the judge "I'll be back." Numerous competing inferences can be drawn from such a statement in that context, no matter how reliably it is established that such was made. While nothing herein precludes the introduction of either statement at trial or sentencing, under this Court's more prejudicial than probative balancing, such allegations simply will not bear the weight of being singled out in the Government's Notice of Intent to Seek the death penalty and presented to the jury as non-statutory aggravating factors.

As such, these non-statutory aggravating factors are hereby DISMISSED.

### iv. Victim Impact Evidence:

██ Defendants Tyrone Walker and Walter Diaz seek an order dismissing as a non-statutory aggravating factor, victim impact evidence from the family of Michael Monsour. They argue that at the time § 848(e) was enacted the introduction of such evidence was unconstitutional. For the same reasons discussed under § i. Prior Criminal Conduct, *supra,* and in light of *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), this motion is DENIED.

### e. Bills of Particular as to the Non–Statutory Aggravating Factors:

██ On September 12, 1995, the Court addressed from the bench the parties' voluminous requests for bills of particular, reserving on the requests seeking particularization of the statutory aggravating factors. Incorporating that discussion of the sufficiency of the discovery provided to date, and mindful of the further discovery that was ordered at that time, the Court again notes that the decision of whether or not to grant a bill of particulars rests within the sound discretion of the district court. *United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984); *see* Fed.R.Crim.P. 7(f).

██ Such motions should be granted only where they are necessary (1) to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense and avoid surprise and (2) to enable him to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987). Fur-

thermore, "if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *United States v. Bortnovsky, supra* at 574. Moreover, inquiry into the government's legal theory is not a proper purpose for a bill of particulars. *United States v. Copen,* 378 F.Supp. 99, 103 (S.D.N.Y.1974). Likewise, "acquisition of evidentiary detail is not the function of the bill of particulars," *See United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990), and there is no requirement that the government particularize its evidence. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990); *United States v. Davidoff,* 845 F.2d 1151, 1152 (2d Cir.1988).

■ In light of the foregoing, then, and after full consideration of all the parties' arguments for and against ordering these bills, and after a complete review of the superseding indictment, the government's Notice of Intent to Seek the Death Penalty, and all the discovery materials the government has provided to date, the Court orders the government to file the following additional limited bills of particular:

**i.** A bill particularizing, *if and as known to the government,* the identities of the drug dealers allegedly robbed by Tyrone Walker from 1988 to 1993, and the dates and locations of those robberies; (Referring to the government's allegations in paragraphs C.4b and C.4e of its Notice of Intent to Seek the death penalty against Tyrone Walker);

**ii.** Particularizing, *if and as known to the government,* the identity of the persons under twenty-one years of age as to whom it is alleged that Tyrone Walker and Walter Diaz distributed controlled substances, and the dates and locations of those distributions; (Referring to the government's allegations in paragraph C.6 of its Notice of Intent to Seek the Death penalty against Tyrone Walker and paragraph C.6 of its Notice of Intent to Seek the Death penalty against Walter Diaz).

### 4. Alternative Juries:

■ In the event that the non-statutory aggravating factors are not dismissed, Tyrone Walker and Walter Diaz also seek from the Court an order that a non-death qualified jury be empaneled for the guilt phase of their trial and that a separate, death-qualified jury be empaneled at the penalty phase. They argue that absent alternative juries they will face incurable prejudice from the necessity of having to *voir dire* at the trial's outset on issues and allegations relevant to sentencing only.

In its decision from the bench of September 12, 1995, the Court discussed *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) in the context of the defendants' various motions for severance and for the Court to employ two juries. The Court finds that the statutory language of § 848(i)(1)(A), and both *Buchanan* and *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), and the principles to be derived therefrom, militate for denial of the defendants' motions. In *Lockhart,* the Supreme Court discussed with approval various capital sentencing plans which provide that the same jury must sit in both phases of a bifurcated capital murder trial and pointed out that it had upheld the same against constitutional attack. *Id.* at 179–80, 106 S.Ct. at 1768–69. In *Buchanan,* the Supreme Court both explicitly addressed and rejected the arguments that a "death-qualified" jury is conviction prone and likely to mete out harsher sentences or in some other respect lacks impartiality. *Buchanan,* 483 U.S. at 418–20, 107 S.Ct. at 2915–16. In both cases the Supreme Court also identified the strong government interests in having one jury for both the guilt and penalty phases of a joint trial. *Id.; Lockhart,* 476 U.S. at 180–82, 106 S.Ct. at 1768–70.

When those principles are read in light of § 848(i)(1)(A)'s affirmative injunction that "the hearing *shall* be conducted ... before the jury which determined the defendant's guilt"[23] (emphasis added), the Court is com-

---

**23.** Even the language of the relevant exception to the statute contemplates that the Court will have initially seated a jury for both phases of the trial. *See* § 848(i)(1)(B)(iii) ("The hearing shall be conducted ... before a jury impaneled for the purpose of the hearing if ... the jury which determined the defendant's guilt has been discharged for good cause").

pelled to hold that defendants' prejudice arguments, arguments held in common with all capital punishment defendants, are insufficient to move the Court to disregard the statute's clear intent. The Court has also carefully considered the dicta of the New Jersey Supreme Court in *State v. Biegenwald*, 126 N.J. 1, 594 A.2d 172 (1991) and the rationale reflected therein. It suffices to say that the Court, joining with the expressed views of the United States Supreme Court, takes a different view of the efficacy of careful *voir dire* and cautionary curative instructions. Defendants' motion for a separate jury at the guilt and penalty phase (if any) of their trial is hereby DENIED.

## 5. Mitigating Factors:

 Defendants Tyrone Walker and Walter Diaz seek an order that, to the extent § 848(*o* )(1) limits the presentation of mitigating evidence, it is unconstitutional. They argue that § 848(*o* )(1) [24] may serve to limit the ability of black and other minority defendants to present certain mitigating evidence. By way of example, defendant Walker indicates that if a penalty stage is reached, he may seek to offer evidence that he was raised surrounded by urban violence and in a culture of pervasive racism, in mitigation of his punishment.

The Court holds in common with the other district courts who have considered these arguments that the purpose of this provision is to "prohibit juries from considering impermissible factors, such as the race of the defendant or victim, as ones which in any way favor the imposition of the death penalty." *Pretlow*, 779 F.Supp. at 775; *Cooper*, 754 F.Supp. at 624. Section 848(*o* ) must also be read in light of § 848(m)'s injunction that "in the sentencing hearing, information may be presented as to matters relating to any of ... the mitigating factors set forth in subsection (m) ... of this section, or *any*

*other* mitigating factor." § 848(m) (emphasis added). Construed in this manner, *see Rust*, 500 U.S. at 189, 111 S.Ct. at 1770, § 848(*o* )(1) does not transgress the cardinal principle that no limitation may be placed upon the right of an accused to present relevant mitigating evidence during a capital penalty trial. *McCleskey v. Kemp*, 481 U.S. 279, 305–06, 107 S.Ct. 1756, 1774–75, 95 L.Ed.2d 262 (1987). As such, defendants' motions for dismissal on this basis are DENIED.

## 6. Arbitrary Choice of Defendants for Capital Punishment:

 Defendants Tyrone Walker and Walter Diaz seek an order dismissing the death penalty aspects of this case as to them because they have been arbitrarily singled out for capital punishment. As noted by Justice Raggi in addressing the same arguments in *Pitera I*, "whether the crime is capital or not, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in its discretion.'" *Pitera I*, 795 F.Supp. at 568 (*quoting Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)) (citations omitted). Defendants point to no facts which would temper application of the foregoing principle to their prosecutions.

As such, their motions to dismiss the death penalty aspects of this case because they have been arbitrarily and capriciously singled out for capital punishment is DENIED.

## 7. Capital Punishment as Both Cruel and Unusual Punishment and Inherently Arbitrary and Capricious:

Defendants Tyrone Walker and Walter Diaz seek an order declaring § 848(e) uncon-

**24.** Section 848(*o* ) reads in pertinent part as follows:

(1) In any hearing held before a jury under this section, the court shall instruct the jury that in its consideration of whether the sentence of death is justified it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, and that the jury is not to recommend a sentence of

death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

Section 848(*o* )(1) further requires the jury to individually sign and certify in writing that they have complied with this provision.

858

stitutional under all circumstances since it amounts to cruel and unusual punishment, and is incapable of fair and even-handed administration in violation of Due Process. After full consideration of their arguments in this regard, the Court finds that dispositive Supreme Court precedents compel the conclusion that their motions on these bases must be DENIED. *See Gregg,* 428 U.S. at 153, 96 S.Ct. at 2909; *McCleskey,* 481 U.S. at 279, 107 S.Ct. at 1756; *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Payne,* 501 U.S. at 808, 111 S.Ct. at 2599–2600.

## C. Systematic Racial Discrimination:

Defendants Tyrone Walker and Walter Diaz seek an order dismissing the death penalty aspects of the government's case because the Department of Justice ("DOJ") has engaged in systematic racial discrimination, or, in the alternative, a hearing on DOJ discrimination, and an order for broad discovery into DOJ's capital policies & procedures.

### 1. Elements of Fifth Amendment Implied Equal Protection:

 A successful equal protection claim must establish that the disputed state action (i) has been applied in a discriminatory manner against the individual defendant, or singled out the defendant from a group of similarly situated individuals, and (ii) was motivated by discriminatory purpose or intent. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). *See also McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1767 (1987) ("[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination' ... and that the purposeful discrimination 'had a discriminatory effect' on him.") (citations omitted); *United States v. Eklund,* 733 F.2d 1287, 1290–91 (8th Cir.1984) (prima facie selective prosecution claim requires showing that the defendant was "singled out for prosecution" and that the government acted with "improper purpose"), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)

(two prongs often referred to as "intentional and purposeful discrimination").

 The burden, of course, lies with the defendant challenging the government's action. However, where, as here, the defendant merely seeks to obtain discovery, the requisite threshold showing is measured by a standard significantly lower than the "heavy burden" normally associated with disposition at trial. *See Bradley,* 880 F.Supp. at 279 (standard for discovery is lower than that for evidentiary hearing, which itself is lower than standard at trial). Courts have expressed this standard of discovery in a number of ways, holding that the defendant need only introduce "some evidence tending to show the existence of the essential elements of the defense," *United States v. Schmucker,* 815 F.2d 413, 418 (6th Cir.1987) (*quoting Berrios,* 501 F.2d at 1211) or that he has carried the relevant "question past the frivolous state," *United States v. Erne,* 576 F.2d 212, 216 (9th Cir.1978), so as to "raise[ ] a reasonable doubt as to the prosecutor's purpose," *United States v. Larson,* 612 F.2d 1301, 1304–05 (8th Cir.), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980). In a recent case involving issues virtually identical to those raised here, Chief Judge Rambo of the Middle District of Pennsylvania demanded only that the defendant set forth "a colorable claim" as to each element of the defense. *Bradley,* 880 F.Supp. at 279.

Applied to defendants' Fifth Amendment equal protection claims, then, the standard associated with discovery requires that defendants show both a "colorable claim that he was singly selected" for capital prosecution and also "make a colorable showing that the reason for his" selection was premised on impermissible factors and discriminatory intent of the part of the prosecutors. *Id.*

### 2. Defendants' Failure to Make the Threshold Showing Necessary to Obtain Discovery:

### i. No Colorable Claim as to Discriminatory Application

 To satisfy the first element of their equal protection claim for purpose of discov-

ery, defendants must make "a threshold showing that others—for example, white defendants—who have been eligible for the death penalty, because of the applicability of ... § 848, have not faced prosecution". *Bradley*, 880 F.Supp. at 280. In particular, defendants must establish a colorable claim "that the decisionmakers in *his* case acted with discriminatory purpose" thereby subjecting them to impermissible, state-sanctioned discrimination, *McCleskey*, 481 U.S. at 292, 107 S.Ct. at 1767 (emphasis in original). After careful consideration of the evidence and arguments cited by defendants, this Court holds that they have failed to adequately establish this first element of their equal protection claim.

Statistics proffered in Defendant's brief suggest that African Americans are 4.7 times more likely than whites to be charged under the capital punishment provisions of § 848(e). Certainly, these numbers, standing alone, are significant. Defendants, however, "offer no evidence specific to [their] own case that would support an inference that racial considerations played" a role here. *McCleskey*, 481 U.S. at 292–93, 107 S.Ct. at 1767. In other words, defendants have not demonstrated how the recorded statistics compel a finding that they themselves were the target of discrimination by prosecutors; instead, they attempt to carry this burden by offering the numbers alone. The significance of this deficiency was best stated by the Supreme Court in *McCleskey*: "[defendants'] claim that these statistics are sufficient proof of discrimination, without regard to the facts of a particular case, would extend to all capital cases ..., at least where the [defendant was black rather than white]." *Id.* at 293, 107 S.Ct. at 1767.

This Court is mindful that its decision on this issue may *appear* to be in conflict with Judge Rambo's analysis in *Bradley*. It is not. In that case, Judge Rambo clearly ex-

plained that "defendant must first show a colorable claim that he was singly selected for prosecution ... defendant has not shown this," 880 F.Supp. at 280. This Court reaches the same conclusion and its inquiry ends there.[25]

### ii. No Colorable Claim as to Discriminatory Purpose

Even if the defendants had satisfied the first element of the equal protection inquiry, this Court finds that they have not fulfilled the requirements of the second. The *McCleskey* Court noted that the phrase " 'discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." 481 U.S. at 298, 107 S.Ct. at 1770. Thus, to successfully establish the second element of their equal protection claim, defendants must make a colorable showing that government actors chose to pursue the death penalty in this case "*because* of an anticipated racially discriminatory effect." *Id.* at 298, 107 S.Ct. at 1770 (emphasis in original) (citations omitted).

As with the first element, a general proposition that African Americans comprise a disproportionately large percentage of § 848(e) capital defendants does not in itself compel an inference that decisions to pursue the death penalty have been motivated by race. Concededly, race assumes a pervasive role in society. Here, however, defendants are asked to present "some evidence" that the Attorney General acted impermissibly and with discriminatory purpose when initiating death penalty prosecutions. Like the defendant in *McCleskey*, defendants have chosen to respond with a collection of disconcerting statistics. In considering defendants' show-

---

**25.** Judge Rambo allowed the analysis to proceed because of her conscientious concern that the statistics "may indicate that white § 848 defendants otherwise eligible for the death penalty have not been subject to the death penalty prosecutions, which could show that [the defendant] has been selectively chosen for punishment." *Id.* (emphasis added).

This Court will not follow suit based in some measure on Judge Rambo's contrary conclusions after her no doubt comprehensive *in camera* review of the materials produced by DOJ in compliance with her order (discussed *infra*), and because of the risk of effectively eviscerating the already minimal burdens imposed by the first element.

ing, the Court looks to *McCleskey* when holding that mere statistics, as presented here, are insufficient to satisfy the threshold requirements of the second element of defendants' equal protection claim.

In reaching this determination this Court takes notice of Judge Rambo's finding from her recent *in camera* review of most of the documents defendants seek to discover here. Following her examination of documents associated with § 848 cases wherein authorization for death penalty prosecutions were sought from the Attorney General, Judge Rambo concluded that "the court can find no support for the hypothesis that the Attorney General approves or disapproves death penalty requests bases on racially impermissible factors. Nor does the evidence submitted indicate that individual United States Attorneys seek the death penalty for racially based motives." *United States v. Bradley*, No CR–92–200–01, slip op. at 5–6 (M.D.Pa. May 27, 1994). Mindful of these unambiguous conclusions, this Court notes that to grant defendants' motion would result only in examination of substantially the same documents and files in search of the same "smoking gun" that was nowhere to be found in *Bradley*. For all the foregoing reasons, the Court finds that the defendants have presented an inadequate basis upon which to resume that search.

Defendants' motions for an order dismissing the death penalty request because the DOJ has engaged in systematic racial discrimination, or, in the alternative, for a hearing on DOJ discrimination, and an order for broad discovery into the DOJ's capital policies & procedures, is DENIED.

**D. Witness Lists:**

■ All the defendants join in seeking early production of the government's witness lists. To compel production of a witness list the defendant must show a specific need for its disclosure. *United States v. Cannone*, 528 F.2d 296, 301–02 (2d Cir.1975). It is not enough simply to assert that such list is necessary in preparation for trial. *United States v. Santoro*, 647 F.Supp. 153, 186 (E.D.N.Y.1986), *rev'd on other grounds, United States v. Davidoff*, 845 F.2d 1151 (2d Cir.1988).

■ Walter Diaz and Tyrone Walker's principal arguments are that in light of the government's expressed intention to call as many as fifty witnesses, early production of the list is necessary for defense preparation. The Court first notes that many of these witnesses are already known to the defense in light of the Brooklyn attempted robbery trial, and discovery and publicity regarding the Monsour and Manhattan incidents. The Court also notes that it has authorized a great deal of investigative resources placed at the defendants' command, further undercutting defendants' arguments. The Court also acknowledges the government's assertion that some of its witnesses have already been contacted by the defendants' investigators.

Beyond this, the defendants have made no sufficient showing of need for early witness list production and so, the motion for *early* production is DENIED.

■ Passing early production, because two of these defendants are charged with capital offenses, those defendants have a statutory right to disclosure of the names and places of abode of veniremen and witnesses three days before commencement of trial pursuant to 18 U.S.C. § 3432. The government has made a motion under the express exception to § 3432, which requires disclosure three days in advance of trial "except that such list of veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." 18 U.S.C. § 3432. The government has moved for an order indicating that the Court will delay identification of their witnesses until after the trial has commenced.[26] The government also main-

26. The government has proposed what it considers to be a reasonable accommodation: that they identify "the vast majority" of their witnesses three days before the taking of evidence begins (witnesses already known to the defendants), and as to approximately twenty other witnesses, the government disclose their identities on the Friday prior to the week in which they are scheduled to testify. The government also indicates that after identifying those witnesses, it would

tains that in any event, it has no obligation to provide the addresses of its witnesses. *See United States v. The Insurgents of Pennsylvania,* 2 U.S. (2 Dall.) 335, 342, 1 L.Ed. 404 (1795) (construing "place of abode" under the statute to require only the township of residence).

As I notified all counsel, on September 1, 1995, on the government's motion, the Court undertook an *in camera* review of the evidence the government proffered regarding the dangers of threats and intimidation directed against witnesses. The Court reserved, and continues to reserve, on the question of whether the evidence was sufficient to establish, by a *preponderance,* such danger to any person so as to justify invoking the exception to § 3432. The Court has also requested that the government submit further affidavits regarding their allegations. In fairness to both sides, however, the Court indicates now that the evidence was sufficient to raise grave concerns as to the safety of third parties. *See, United States v. Higgs,* 713 F.2d 39 (3d Cir.1983) *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984); *United States v. Cannone,* 528 F.2d 296 (2d Cir.1975). In response to Walter Diaz's "prejudicial spillover" arguments the Court also notes that some evidence was presented against all three defendants. The Court also mentions in this regard that all three defendants have vigorously insisted on their right to communicate with each other while incarcerated and the Court has, to the extent it could, assisted in making this possible.

By way of conclusion, then, *early* production of the witness list is DENIED and the Court RESERVES on the government's application under the exception to § 3432.

## III. CONCLUSION

By this Memorandum Decision and Order, coupled with the Court's decisions from the

bench on September 12, 1995, the Court has addressed each and every of the government's, and the defendants', numerous and extensively briefed pre-trial motions. All requests for relief which have heretofore not been expressly granted or reserved upon are denied.

**IT IS SO ORDERED.**

---

make every effort to make them available to defense counsel at a state police barracks, the U.S. Attorney's office or some other neutral(?) location.

At oral argument the defense and the government met privately to discuss this proposal. Without reaching an agreement, the parties sought leave to brief what the Court believed

were issues of impasse within what was otherwise some form of agreement as to a mutually satisfactory procedure for witness lists. The briefing received by the Court, however, merely reargues the principal questions as outlined *infra,* and makes no reference to the prospect of a stipulation as to these issues.